# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### April 10, 2007 Session

## STATE OF TENNESSEE v. DEVIN BANKS

**Direct Appeal from the Criminal Court for Shelby County**
**No. 03-01956     Joseph B. Dailey, Judge**

---

**No. W2005-02213-CCA-R3-DD  - Filed July 6, 2007**

---

A Shelby County jury found the Appellant, Devin Banks, guilty of the first degree premeditated murder of Kadhem Al-Maily and the Class A felonies of criminal attempt to commit first degree murder and especially aggravated robbery of Hussain Atilebawi.   Following the penalty phase hearing, the jury found the presence of two statutory aggravating circumstances and imposed the sentence of death.  In a separate sentencing hearing, the trial court sentenced Banks to twenty-five years for each of the Class A felonies and ordered them to be served consecutively to one another and to the sentence of death.  Banks now seeks review by this court of both his convictions and resulting sentences, presenting the following issues for review: (1) whether the evidence is sufficient to sustain his convictions; (2) whether the trial court erred in admitting a photograph of the surviving victim; (3) whether the trial court erred in admitting Banks' statements absent a ruling on the motion to suppress; (4) whether the trial court erred in admitting hearsay statements made by the victim; (5) whether the trial court failed to properly certify the Arabic translator; (6) whether the trial court failed to properly instruct the jury as to lesser included offenses; (7) whether the indictment failed to charge a capital offense; (8) whether the victim impact jury instruction was coercive; (9) whether the closing argument by the prosecutor was improper; (10) whether the sentences for the non-capital offenses are excessive; (11) whether Tennessee's death penalty statutes are constitutional; and (12) whether the death sentence in this case is disproportionate to death sentences in other cases. Following review, we affirm Banks' convictions for first degree murder, criminal attempt to commit first degree murder, and especially aggravated robbery.  His sentences for the Class A felony convictions are also affirmed.  We further conclude that the evidence does not support application of the (i)(6) statutory aggravating circumstance. Nonetheless, we conclude that the error is harmless, and the sentence of death is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

DAVID G. HAYES, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Robert Jones, Shelby County Public Defender; Phyllis Aluko and Tony Brayton, Assistant Public Defenders (on appeal); Kathy Kent and Latonya Burrow, Assistant Public Defenders (at trial), Memphis, Tennessee, for the Appellant, Devin Banks.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael Moore, Solicitor General; Clarence Lutz, Assistant Attorney General; William L. Gibbons, District Attorney General, Stacy McEndree, Assistant District Attorney General, and Karen Cook, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

### Factual Background

### I. Guilt Phase Evidence

In September 2002, Hussain Atilebawi, who emigrated to the United States in 1997, resided at 1191 North Graham in Memphis. Atilebawi owned a mechanic shop, worked at a grocery store, and sold cars. On September 16, 2002, Atilebawi was at his home watching Arabic satellite television with a friend, Kadhem Al-Maily, who was commonly referred to as "Uncle." At approximately 2:00 a.m., an individual known to Atilebawi as "Boo" visited his home and asked to use the telephone. "Boo" went outside with the phone, and Atilebawi followed. When Atilebawi approached "Boo," he was shot multiple times, including two shots to the head. "Boo" was later identified as the Appellant, whom Atilebawi had previously hired to perform various jobs.

Following the shooting, Atilebawi was unable to move, and he watched the Appellant enter the house, where $6,500 in cash was on the table. While outside, Atilebawi heard two gunshots fired inside the house. Shortly thereafter, the Appellant left in one of Atilebawi's vehicles, a red Jeep Cherokee, and another person left in "Uncle's" Chevrolet Caprice. As the Appellant was leaving, Atilebawi observed the cash in the Appellant's hand. After the Appellant left, Atilebawi managed to re-enter his house and call for help.

Memphis Police Officer Steven Jones responded to the call at 1191 North Graham Street. Upon arrival, Officer Jones discovered Atilebawi, still alive, in the den with multiple gunshot wounds. Jones was able to speak with Atilebawi, whom he described as being in a "dazed, confused state." Jones further noted that Atilebawi had a "[gunshot wound] to the shoulder, one to the leg, and also had a laceration, what appeared to be a laceration on his arm and a severe head injury." He also discovered Al-Maily in the bedroom with a fatal gunshot wound to the head. Jones further observed blood "all over the walls . . . looked like it had . . . hand prints and different stuff like that. . . ."

Atilebawi informed Officer Jones that "a person that he knew as Boo had asked to use his phone." He further explained:

As [Boo] was talking on the phone he was acting very suspicious. And at that time [Boo] walked out. [Atilebawi] felt a very sharp pain to his head and to his shoulder and heard a couple pops and [Boo] ran back inside the house.

. . . .

. . . They were outside talking because [Boo] walked back outside with the phone. . . . He said that some of it happened outside and some of it happened inside. . . .

Atilebawi was transported to The Regional Medical Center at Memphis, where Sergeant Mark Miller was able to speak with him. At this time, Atilebawi was able to identify his assailant as a black male known to him as "Bull" or "Boo." Atilebawi told Miller that "Boo" had knocked on his door and asked to use the telephone. According to Atilebawi, "Boo" proceeded to use the telephone and, after handing the telephone back to Atilebawi, shot him multiple times.

While at the scene, Officer Jones observed that several vehicles were missing from the driveway. Officer Patricia Turnmire also responded to the scene, and she discovered numerous items on which blood splatters were observed, including a telephone receiver, a cut-up shirt, and an envelope. Sergeant James Fitzpatrick responded to the scene and was designated scene coordinator. Sergeant Fitzpatrick observed blood in the driveway prior to entering the house. He also noted that the bedroom in which the body of Al-Maily was found was ransacked and that the condition of this room was "out of the ordinary" compared to the remainder of the house, which was neatly kept.

Later that morning, at approximately 9:30 a.m., Sergeant Miller observed a red Jeep Cherokee which matched the description and tag number of Atilebawi's vehicle. Officer Jones, along with Sergeant Miler and two other officers, stopped the vehicle. The driver of the vehicle identified himself as Devin Banks, and he was placed under arrest at that time. Officers discovered $1253 in cash on the Appellant's person.

Sergeant Miller, along with Lieutenant Michael Williams, interviewed the Appellant. Sergeant Miller advised the Appellant of his rights, and the Appellant signed the Advice of Rights form acknowledging that he understood his rights. The Appellant also consented to the search of a 1993 Ford Explorer. During the interview process, the Appellant indicated that he was aware of the death of Al-Maily and the shooting of Atilebawi, describing his relationship with Atilebawi as "best friends." The Appellant admitted that he was present during the commission of the offenses, but he stated that another individual, Brian Winters, had also been present. The Appellant related that, while at the residence, he used the telephone and later got into an argument with Atilebawi. The Appellant admitted that he struck Atilebawi three or four times in the face during the argument, which involved Atilebawi's alleged molestation of the Appellant's girlfriend a year earlier. However, he maintained he was not responsible for either shooting.

Brian Winters was interviewed by police on September 17, 2002. During the interview, he maintained that he was at his home on Buchanan the entire night of the crime, and he provided the names of other persons who were supposedly at the house with him.

On September 17, 2002, Sergeant Fitzpatrick conducted a second interview of the Appellant. The Appellant again indicated that he understood his rights and agreed to provide a statement to police. In his second statement, the Appellant admitted that his prior statement was not entirely truthful. Specifically, the Appellant now stated that he, not Brian Winters, was the person responsible for the shootings of Al-Maily and Atilebawi. He added that he used "a small black automatic weapon a .22 or a .25" belonging to Michael Hilliard. According to the Appellant, he had obtained the gun from Hilliard on Sunday evening, September 15th. The Appellant explained that the shootings were "[t]o get revenge on [Atilebawi] because he cheated me out of a large sum of money and molested my four-month pregnant fiancée." He added that Michael Hilliard knew of the Appellant's plans and that they had talked about disposing of Atilebawi's body in the Wolf River.[1]

During this second interview, the Appellant further explained that he did not expect Al-Maily to be at Atilebawi's residence and, further, that he did not intend to shoot Atilebawi. The Appellant related the events preceding the shooting as follows:

> [Atilebawi] kept saying that I was a no good – that I was no good and [a] bad father to my son. I pulled the pistol from my right pocket and I closed my eyes and I fired one round off. [Atilebawi] went to reach at me to grab me and I fired two more and ran inside the house. And Uncle stood by the door and let me in. By the time Mike was coming around the corner, Uncle handed me money and asked me what was going on. I made Uncle go [to] the bedroom and stay. Mike comes in and we started searching the house for the money. Mike grabbed keys from the living room . . . coffee table to the Jeep and the Caprice. I seen speakers and clothes and put them in the Jeep. Uncle was laying on the floor face down and I covered up Uncle with a brown blanket, pointed the gun to the floor, closed my eyes and fired one more shot and ran out of the house. I got in the red Jeep and Mike got in the Caprice and we left. . . .

The Appellant stated that, when he left, Atilebawi was still in the driveway. The Appellant added that he knew Atilebawi was alive because Atilebawi was looking at him, repeating the Appellant's name.

Memphis Police Officer Eric Hutchison later located "Uncle's" 1990 Caprice Classic at the Tupelo Manor Apartments in the area of Meagher and Jackson. Three vehicles were

---

[1]Co-defendant Michael Hilliard was jointly charged with the Appellant in a five-count indictment for the murder of Kahdem Al-Maily and the attempted first degree murder of Hussain Atilebawi. However, Hilliard's case was severed from the Appellant's case prior to the start of the trial.

ultimately seized and towed by the Memphis Police Department during the investigation: a Chevrolet Caprice, a red Grand Jeep Cherokee, and a white Ford Explorer. Officer Kevin Shaver, along with Sergeant Fitzgerald, processed the vehicles. Upon inspection of the Ford Explorer, Officer Shaver discovered a small revolver, a .22 or .25 caliber, located in the console area. When discovered, the weapon was not loaded.

The nineteen-year-old Appellant was a friend of Sherry Tomason's children. On September 15, 2002, Ms. Tomason was sitting on her front porch when her son John arrived home at approximately 11:00 to 11:15 p.m. with the Appellant in a white SUV, which had a flat tire. John informed Ms. Tomason that they had already changed one flat tire on the vehicle earlier that evening. Ms. Tomason permitted the Appellant to park the vehicle in the yard, and she asked him if he needed a ride, as it was so late. The Appellant responded that he did not need a ride because he was going to meet his brother at the church. The Appellant added that he and his brother were going to see the man that he had bought the car from in order to get another one. Ms. Tomason later saw the Appellant and his brother walk by her house and again asked the men if they needed a ride. They responded that they did not and informed her that "the guy they bought the car from lived just around the corner." Ms. Tomason next saw the Appellant around 7:15 a.m. the following morning driving a red Jeep Cherokee.

In September 2002, Lonnell Smith was employed as the manager of Maco Tire and Auto Care in Memphis. On September 16, 2002, a customer, between eighteen and twenty years old, came into the store to purchase tires for a Jeep Cherokee, which Smith described as a red Jeep Laredo. Smith stated that nothing was wrong with the tires on the Jeep, but, nonetheless, the customer stated that he was interested in purchasing new tires and new rims for the vehicle. While at the store, the customer purchased a set of tires and rims for $1,500.00, with payment in cash, "reeling off hundred dollar bills." As he was placing the old tires and rims in the back of the vehicle, Smith observed "a lot of clothes and hats" in the car. The customer explained that "he sold clothes and that he just came back from St. Louis selling clothes." Smith later identified the Appellant as the customer who purchased the rims and tires on September 16, 2002.

Dr. Shelly Timmons, a neurosurgeon whose primary practice is at The Regional Medical Center at Memphis, treated Atilebawi during his post-operative treatment following the shooting. Atilebawi suffered "two injuries that were gunshot rounds inflicted." "One was to the right temporal region . . . [a]nd one was to the left occipital. . . ." The injury to the right temporal region required surgery as "[i]t had penetrated through the scalp and the skull and there was some bone and bullet fragments within in the brain." Atilebawi also had "a partial lobectomy, which is removal of the temporal lobe, which is part of the brain that had to be taken out that was damaged." Dr. Timmons related that part of the frontal lobe also had to be removed. As a result his injuries, Atilebawi was hospitalized for one month. He no longer resides at 1191 North Graham, and he is no longer able to work.

Dr. O'Brian Cleary Smith performed the autopsy of Al-Maily on September 16, 2002. Dr. Smith concluded that Al-Maily died as a result of a near gunshot wound to the head. The

bullet entered his head behind the right ear about four and one-half inches below the top of his head. There were also powder burns present on the scalp. "The bullet proceeded through the scalp, through the skull to impact the front portion of the skull and then ricocheted from the front portion on the right side of the head, it ricocheted over to the left portion of the brain in the front . . . and that was the lethal injury." According to Smith, Al-Maily also sustained other injuries to his head, which were inflicted prior to his death.

Following trial, the jury returned verdicts finding the Appellant guilty of first degree premeditated murder, first degree felony murder, criminal attempt to commit first degree murder, and especially aggravated robbery. The trial court subsequently merged the convictions for premeditated murder and felony murder into one judgment of conviction for first degree premeditated murder.

## II. Proof at Penalty Phase

Hussain Atilebawi, the surviving victim of the Appellant's actions, testified that he had known the deceased victim, "Uncle," for a very long time and that the two men were quite close. Since "Uncle's" death, Atilebawi "cri[es] everyday," and he feels like he lost "something big." He stated that "Uncle" helped everyone, including his family members in Iraq to whom he sent money.

Mary Hughes, Atilebawi's caretaker and girlfriend, testified that she has known Atilebawi for ten years. She explained that she also knew "Uncle," who was given the nickname "[b]ecause he was, like, the Uncle of the whole group. If they needed something, he'll help them. He was a real good guy like that. . . ." She further explained that, as Atilebawi had no family in the United States, "Uncle" had been his family. Ms. Hughes testified that Atilebawi had first learned that "Uncle" had died when he was in the hospital being treated for his gunshot wounds and that he was devastated. She stated that Atilebawi keeps a photograph of "Uncle" in his wallet and cries to himself almost every day.

In mitigation, the Appellant presented several witnesses. The Appellant's mother, Margaret Banks, testified that the Appellant was one of ten children, but the children did not share the same father. She explained, "Kevin, Myron and Tommy has the same father. Devin has a father. Nicole has a father. Jimmy Lee, the father is dead. Robert has a father. Deangela and Eva has a father." Ms. Banks stated that the Appellant was the seventh son and that he was born on August 2, 1983. While Ms. Banks never married the Appellant's father, he did, however, pay child support until the Appellant turned seventeen.

Ms. Banks stated that she was currently confined in the Tennessee Department of Correction for a parole violation, and she admitted that she had previously been incarcerated on other occasions, explaining "[m]ost of my time I spent in jail or either in halfway houses." Ms. Banks has a criminal history going back to 1985, and she stated that she was incarcerated in 1985, in 1990, from 1997 until 2000, and in 2005. During the periods of her incarceration, she

relied upon the church to raise the Appellant. She further explained that, during the periods when she was not incarcerated, she and her children "moved around a lot." Ms. Banks stated that, although she was frequently incarcerated, she retained custody of all children with the exception of Jimmy Lee, who was raised by the mother of a "son that I was with at the time." However, she further explained that she had lost custody of two of her daughters, Deangela and Eva, when she was in correctional custody and that Kevin was taken by DHS, but she did not lose custody of him.

Regarding the Appellant's education, Ms. Banks testified that he attended at least eight different schools. The longest time he was at one school was two years, and he never graduated from high school. Ms. Banks stated that, as a child, the Appellant enjoyed country music and cooking. The Appellant also enjoyed writing poetry, and he liked his pets. Ms. Banks testified that the Appellant "went to church whenever church was opened." She described the Appellant as a "loner," explaining that older children "used to beat on him and talk crazy to him" because he was smaller. Ms. Banks further admitted several incidents in which the Appellant was in trouble as a juvenile. Specifically, the Appellant was in juvenile court in May 1996, on a charge of theft of property, and in September 1996, on a charge of theft of a motor vehicle.

Ms. Banks stated that her mother, Eva Hill, died in 1997. According to Banks, her mother was the one responsible for keeping the family together, and, when she died, Ms. Banks "got lost within [her]self." The Appellant was also deeply affected by the passing of his grandmother.

Ms. Banks testified that the Appellant had been employed at a McDonald's restaurant and that he also worked for a carpenter. The Appellant also had a job welding, but he had injured his eyes. Ms. Banks further testified that the Appellant has been HIV-positive since he was sixteen years old.

Ms. Banks stated that the Appellant was never a "problem child." She related that she has a "close" relationship with the Appellant, describing their relationship, at times, as more friends than mother-son. Ms. Banks pleaded for the jury to spare his life and not impose the death penalty, and she stated that should a sentence less than death be imposed, she would not abandon the Appellant and would keep in contact with him.

Kiley Shay, who had known the Appellant for about eight years, testified that she attended church with the Appellant at Leewood Baptist Church. Since his arrest, the Appellant has maintained contact with Ms. Shay and has written her letters. Ms. Shay stated that she "love[s] [the Appellant] with all [her] heart as a friend," and she explained that the Appellant had helped her through the hardest time of her life. She asked the jury to give the Appellant the chance to live.

Thomas Fitzpatrick also attended church with the Appellant. He and the Appellant participated in church-related functions together, and Fitzpatrick considers himself to be a friend of the Appellant's. He asked that the Appellant not be sentenced to death.

Debra Shay, the mother of Kiley Shay, testified that she had known the Appellant since 1997. As did her daughter, Ms. Shay first met the Appellant at Leewood Baptist Church, which no other member of the Appellant's family attended. Ms. Shay testified that the Appellant called her "mom," and she identified various drawings of the Appellant's that he intended to have tattooed on his person. She described the Appellant as "sweet and kind" and stated that he "just wanted somebody to love him." Ms. Shay specifically stated that the Appellant "wouldn't hurt a fly." She also testified that she would continue to have contact with the Appellant. She explained that the Appellant had "[e]verything . . . stacked against him." Despite the Appellant's numerous infractions of the law, Ms. Shay still felt the Appellant was a good person.

The Appellant's half sister, Denise Johnson, explained that she and the Appellant had different fathers. Ms. Johnson testified that, when their mother was incarcerated, their grandmother, Eva Hill, was responsible for their care. Ms. Johnson confirmed accounts of the Appellant's participation in church activities, his fondness of dogs, and his work history. She further confirmed that the Appellant learned that he was HIV-positive when he was sixteen years old and that he had a hard time coping with this diagnosis and had attempted suicide on two occasions. Ms. Johnson also testified that the Appellant had previously dated Sondra Renee Thompson.

Ms. Johnson further testified that the Appellant was a good person and that they were close, and she stated that she would not abandon the Appellant if he was sentenced to life imprisonment. She explained that the Appellant was a "very, very loving person" and that, if he was sentenced to death, it would "hurt." She further related that the Appellant had lived with her for a short time in 2002, and explained that, due to their mother's absence, she often had to assume the role of mother.

The Appellant's brother, Robert Hill, also testified and explained that he was fifteen years older than the Appellant and that he had been incarcerated from 1992 to 2000. Hill explained that he was raised by his grandmother and that he had assumed his grandfather Hill's last name. Hill confirmed that the Appellant was HIV-positive, and he described the Appellant as "a peaceful, calm kid." He recalled that the Appellant liked to draw and that he was active in the church. Hill also pleaded with the jury that they not sentence his brother to death. He explained that the members of his family were often separated from one another, and, in this regard, Hill stated that the Appellant needed "more love," "more attention," and "an unbroken home."

Four deputy jailers from the Shelby County jail testified that the Appellant was not a problem inmate and that he was a kind individual. These officers all stated that, although the Appellant had been written-up on two jail infractions, their opinion of the Appellant was not changed.

Commander Roy L. Rogers of the Shelby County Sheriff's Department testified that he is the program manager for inmates housed at 201 Poplar and also at the Jail East facility. Available programs supervised by Commander Rogers include educational and religious programs. Commander Rogers is also the recreational manager and the volunteer coordinator. He explained that participation in the programs is entirely voluntarily on behalf of the inmates. Commander Rogers stated that the Appellant had completed the "Stop the Violence" program, the anger management program, the driving under the influence of alcohol program, the Keeping It Real program, the Alcohol and Drugs Anonymous program, and the moral recognition program. The Appellant also completed Bible correspondence courses. Additionally, in conjunction with Tennessee State University, the Appellant completed courses in starting your own business and financial planning.

Commander Rogers further testified that, during his incarceration at the Shelby County Jail, the Appellant received two write-ups, one in January 2004, and another in September 2004. He described one infraction as major and the other as medium. The January 2004 incident involved a verbal altercation between the Appellant and another inmate, but no physical violence was involved. The second incident involved the Appellant's refusal of a staff order. Commander Rogers stated, however, that the fact that the Appellant had received only two write-ups in two years of incarceration was rare.

In rebuttal, the State presented the testimony of Sondra Thompson, the Appellant's former girlfriend, who began dating the Appellant in November 2000 and ended their relationship in December 2001. She explained that she had to end the relationship because she "couldn't deal with the abuse, the verbal abuse, the physical abuse, I couldn't deal with it anymore."

Ms. Thompson learned of the Appellant's medical condition through one of the Appellant's ex-girlfriends. The Appellant himself denied being HIV-positive, only confirming to Thompson that he had a blood disease. In fact, the Appellant only verified the true status of his disease when Ms. Thompson took him to St. Jude to get his medication. She stated that at no time during their relationship was the Appellant hospitalized or unable to work due to his being HIV-positive. Ms. Thompson further related that the Appellant would not regularly take his medication, only taking it when he got to the point that it was needed.

Ms. Thompson testified that the Appellant did not act like the same person around her, stating that he acted like a totally different person around his friends and other people. On October 13, 2001, Ms. Thompson called the police because the Appellant had grabbed her and punched her in the eye. Ms. Thompson had to call the police again on December 28, 2001, after the Appellant had slapped her and grabbed her throat. Ms. Thompson reported yet another incident, which occurred when she was eight months pregnant. During that incident, in which she and the Appellant had gotten into an argument, the Appellant held a gun to her stomach and then to himself.

Ms. Thompson stated that she was sexually molested by the victim Atilebawi during an incident which occurred in September 2001 at Atilebawi's home. She stated that the incident involved her waking up with her shorts cut. However, Ms. Thompson explained that she never saw Atilebawi do anything to her, nor did she recall Atilebawi ever touching her sexually. She further stated that the Appellant was also in the room at the time of the incident. The police were never contacted, and Ms. Thompson recalled that the Appellant did not seem surprised or upset over Atilebawi's conduct.

Following the proof, the trial court instructed the jury regarding the statutory aggravating and mitigating factors as follows:

> Tennessee law provides that no sentence of death or sentence of imprisonment for life without the possibility of parole shall be imposed by a jury, but upon unanimous finding that the State has proven beyond a reasonable doubt the existence of one or more of the statutory aggravating circumstances, which in this case shall be limited to the following:
>
> One, the murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the defendant or another;
>
> Two, the murder was knowingly committed, solicited, directed, or aided by the defendant while the defendant had a substantial role in committing or attempting to commit or was fleeing after having a substantial role in committing or attempting to commit any robbery.
>
> . . . .
>
> Members of the jury, I have read to you the aggravating circumstances which the law requires you to consider if you find proven beyond a reasonable doubt. You shall not consider any other facts or circumstances as an aggravated circumstance in deciding whether the death penalty, or imprisonment for life without the possibility of parole, would be appropriate punishment in this case.
>
> Mitigating circumstances. Tennessee law provides that in arriving at the punishment the jury shall consider as previously indicated, any mitigating circumstances raised by the evidence, which shall include, but are not limited to the following: The [Appellant] . . . has no significant history of prior criminal activity. Convictions for the crimes of aggravated assault, aggravated burglary, domestic violence assault, and attempted aggravated burglary are not aggravating circumstances to be considered in determining the penalty but . . . convictions of these crimes may be considered in determining whether or not the [Appellant] has a significant history of prior criminal activity.

Two, the youth of the [Appellant] at the time of the crime.

Three, the [Appellant] was an accomplice in the murder committed by another person and the [Appellant]'s conduct was relatively minor.

Four, the [Appellant] is HIV positive and as a result of his illness, the [Appellant] has attempted to take his own life.

Five, the [Appellant] has held several jobs in spite of his illness.

Six, the [Appellant] transferred from school to school and was unable to maintain friendships established at school and did not complete high school.

Seven, the [Appellant] was one of ten children and he received only limited support from his mother and father.

Eight, the [Appellant]'s family moved around from place [to place] and were never really together. Additionally, some of the children were removed from the home.

Nine, the [Appellant]'s two younger sisters were raped.

Ten, [the Appellant]'s mother is currently incarcerated and has been incarcerated for the majority of the [Appellant]'s life. In addition, the [Appellant]'s brother Robert Hill was incarcerated during a majority of the [Appellant]'s life.

Eleven, the [Appellant] . . . was the youngest of seven brothers and the brothers beat the [Appellant] and picked on him to the point that others had to intervene.

Twelve, despite the lack of family support, the [Appellant] was an active member of Leewood Church and participated in the youth activities.

Thirteen, the [Appellant] cared for his pets, tried to improve his domestic skills by learning to cook and has a talent for drawing.

Fourteen, the [Appellant] has been a good inmate.

Fifteen, while incarcerated the [Appellant] has completed numerous programs aimed at rehabilitation.

Sixteen, the [Appellant] has touched the lives of others in a positive way.

Seventeen, both the [Appellant]'s family and friends from church will continue to keep in contact with the [Appellant] and support him while he is incarcerated.

And eighteen, any other mitigating factor which is raised by the evidence produced either by the prosecution or the defense at either the guilt or the sentencing hearing. That is, you shall consider any aspect of the [Appellant]'s character, or record or any aspect of the circumstances of the offense favorable to the [Appellant] which is supported by the evidence.

The trial court further instructed the jury that, should they find that at least one statutory aggravating circumstance had been proven beyond a reasonable doubt and that that circumstance had been proven by the State to outweigh any mitigating circumstances beyond a reasonable doubt, the sentence shall be death. The trial court also provided instructions as to how the jury was to reduce their verdict to writing.

Court was adjourned for the day, and the jury was to begin deliberations the next morning at 9:00 a.m. At 11:06 a.m., the following morning, the jury returned with its verdict, finding that the State had proven beyond a reasonable doubt the presence of both the (i)(6) and the (i)(7) aggravating circumstances. The jury further determined that these factors outweighed any mitigating circumstances and, accordingly, imposed the sentence of death.

**Analysis**

**I. Guilt Phase Issues**

    **a. Sufficiency of the Evidence**

The Appellant challenges the sufficiency of the convicting evidence to support his convictions for first degree premeditated murder, first degree felony murder, criminal attempt to commit first degree murder, and especially aggravated robbery. Specifically, he asserts that the "dearth of evidence presented at trial that would establish [his] *mens rea* would prevent a rational trier of fact from finding him guilty beyond a reasonable doubt of all charges." In support of his argument, the Appellant relies upon what he deems the only proof of premeditation, his own statements. Specifically, he contends that he was not even aware that Al-Maily was at Atilebawi's residence. Moreover, he argues that the evidence suggests that he acted in the heat of passion during an argument with Atilebawi concerning the sexual assault of the Appellant's former fiancée and the swindling of a large sum of money from the Appellant.

When a challenge is made on appeal to the sufficiency of the convicting evidence, this court is guided by certain well-established principles. First, a jury conviction removes the presumption of innocence with which a defendant is cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. *State v. Rice,* 184 S.W.3d 646, 661 (Tenn. 2006); *State v. Tuggle,* 639 S.W.2d 913,

914 (Tenn. 1982). In determining the sufficiency of the evidence, this court does not reweigh or reevaluate the evidence. *Rice,* 184 S.W.3d at 662; *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn. 1978). Likewise, it is not the duty of this court to revisit questions of witness credibility on appeal, that function being within the province of the trier of fact. *See generally State v. Adkins*, 786 S.W.2d 642, 646 (Tenn. 1990); *State v. Burlison*, 868 S.W.2d 713, 718-19 (Tenn. Crim. App. 1993). Instead, the defendant must establish that the evidence presented at trial was so deficient that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994), *cert. denied*, 513 U.S. 1086, 115 S. Ct. 743 (1995); Tenn. R. App. P. 13(e). Moreover, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. *State v. Harris,* 839 S.W.2d 54, 75 (Tenn. 1992), *cert. denied,* 507 U.S. 954, 113 S. Ct. 1368 (1993). In *State v. Matthews,* 805 S.W.2d 776, 779-80 (Tenn. Crim. App. 1990), *perm. app. denied,* (Tenn. 1990), this court held these rules applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both.

### 1. First Degree Premeditated Murder

In *State v. Jackson*, our supreme court held that "the second degree murder presumption is now obsolete." 173 S.W.3d 401, 403 (Tenn. 2005). The State is held, at trial, to the burden of establishing all the elements of the crime beyond a reasonable doubt. First degree premeditated murder is statutorily defined as "[a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2003). An act is premeditated if the act is "done after the exercise of reflection and judgment." *Id*. at (d). In other words, the "intent to kill" must have been formed prior to the act of murder itself. *Id*. Additionally, it is not necessary that the purpose to kill pre-exist in the mind of the accused for a definite period of time; however, the trier of fact must be satisfied that the accused was sufficiently free from excitement and passion as to be capable of premeditation. *Id*.

The element of premeditation is a factual question to be determined by the trier of fact with consideration of all the circumstances surrounding the killing. *Jackson*, 173 S.W.3d at 408 (citing *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003)). Because the trier of fact cannot speculate as to what was in the killer's mind, the existence of facts of premeditation must be determined from the killer's conduct in light of the surrounding circumstances. *Id*. (citing *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997), *cert. denied*, 523 U.S. 1083, 118 S. Ct. 1536 (1998)). Our supreme court has identified numerous circumstances that may support a finding of premeditation, including, but not limited to: declarations by the defendant of the intent to kill, evidence of procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, the infliction of multiple wounds, preparation before the killing for concealment of the crime, destruction or secretion of evidence of the murder, and calmness immediately after the killing. *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000). In addition to these factors, the establishment of the motive for the killing is yet another factor from which the trier of fact may infer premeditation. *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004).

-13-

The proof presented in the present case reveals that the Appellant knew Hussain Atilebawi. In his statement to law enforcement officers, the Appellant stated that, on the night prior to the shootings, he obtained a weapon and went to Atilebawi's home to confront him about money he believed Atilebawi owed him and to question Atilebawi regarding an incident with the Appellant's pregnant girlfriend. The Appellant had previously enlisted the aid of Michael Hilliard to assist in his objectives. Hilliard knew of the Appellant's plans, and they had discussed disposing of Atilebawi's body in the Wolf River.

Arriving at Atilebawi's residence, the Appellant was surprised to find Al-Maily, but, nonetheless, the Appellant proceeded with his plan. The Appellant asked to borrow the telephone and stepped outside the house. Atilebawi followed the Appellant outside, and the Appellant fired one round from his weapon. Atilebawi attempted to grab the Appellant, and the Appellant reacted by firing two more rounds. The Appellant then returned to the house leaving Atilebawi outside. The Appellant took approximately $300 from Al-Maily and ordered him to go into the bedroom. By this time, the Appellant's accomplice, Michael Hilliard, had arrived. The two then ransacked the home in search of valuables. The men took the keys to both Al-Maily's Chevrolet Caprice and Atilebawi's Jeep Cherokee, as well as various other items, such as speakers and clothes. After loading these items into the Jeep Cherokee, the Appellant returned to the bedroom and ordered Al-Maily to lie face down on the floor. The Appellant proceeded to cover Al-Maily with a blanket, and he fired one shot into Al-Maily's head, killing him. The Appellant then left the house, disregarded Atilebawi's pleas for help, and proceeded to go on a shopping spree. Atilebawi's testimony and his statements to law enforcement officers shortly after the incident confirmed that the Appellant was at Atilebawi's home at the time of the shootings. The Appellant's statements to the police are corroborated by Atilebawi's statements that the Appellant had asked to use his telephone and that the two of them were outside the residence when Atilebawi was shot.

Applying the factors identified by our supreme court, we conclude that there are numerous circumstances from which the jury could have concluded that the murder was premeditated. For example: (1) the victim was unarmed; (2) the particular cruelty of the killing, as evidenced by the Appellant ordering the victim to lie face down and, in execution style, shooting the helpless victim in the head; (3) the Appellant securing a weapon prior to the murder; and (4) calmness immediately after the killing as shown by the Appellant leaving the crime scene and proceeding to go on a shopping spree. Viewing the evidence and inferences in the light most favorable to the State, the evidence is sufficient to support the jury's finding of premeditation.

Thus, upon review, we conclude that the Appellant's argument that he lacked the requisite mental state for premeditated murder is not persuasive. The Appellant's own statement confirms that the execution-style murder of Al-Maily was committed without passion and was completed after the Appellant had removed valuables from the home. Whether premeditation exists is for the jury to decide. *State v. Morris,* 24 S.W.3d 788, 796 (Tenn. 2000). Having reviewed the entire record, we conclude that a jury could have found the essential elements of

premeditation and intent beyond a reasonable doubt. Thus, the Appellant has not met his burden of proving the evidence was insufficient to support his conviction for premeditated murder.

## 2. First Degree Felony Murder

First degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy." T.C.A. § 39-13-202(a)(2). No culpable mental state is required for conviction of felony murder except the intent to commit the enumerated offenses or acts in subdivision (a)(2). T.C.A. § 39-13-202(b). Additionally, the death must occur "in the perpetration of" the enumerated felony. *State v. Hinton*, 42 S.W.3d 113, 119 (Tenn. Crim. App. 2000) (citations omitted). However, the killing may precede, coincide with, or follow the felony and still be "in the perpetration of" the felony, so long as there is a connection in time, place, and continuity of action. *State v. Buggs*, 995 S.W.2d 102, 106 (Tenn. 1999). If the underlying felony and killing were part of a continuous transaction with no break in the chain of events and the felon had not reached a place of temporary safety between the events, felony murder is sufficiently established. *State v. Pierce*, 23 S.W.3d 289, 294-97 (Tenn. 2000). Proof of the intention to commit the underlying felony, and at what point it existed, is a question of fact to be decided by the jury after consideration of all the facts and circumstances. *Buggs*, 995 S.W.2d at 107.

The Appellant contends that the evidence is insufficient to support a conviction for first degree felony murder, arguing that there is no proof that he intended to rob Al-Maily. He asserts that the removal of items from the residence was an afterthought and that he did not even know that Al-Maily would be at the residence when he arrived. He further alleges that a conviction may not be solely based upon a defendant's confession.

The proof at trial revealed that after shooting Atilebawi, the Appellant went back inside the house and demanded money from Al-Maily and ordered him to go the bedroom. Numerous items were taken from the home in addition to Atilebawi's Jeep Cherokee and Al-Maily's Chevrolet Caprice. After placing the various items in the Jeep Cherokee, the Appellant returned to the bedroom and fatally shot Al-Maily. The proof reveals that the Appellant intentionally deprived both Atilebawi and Al-Maily of their property by means of violence. Accordingly, we conclude that the proof is sufficient to support the Appellant's conviction for first degree felony murder.

## 3. Criminal Attempt to Commit First Degree Murder

The Appellant additionally challenges his conviction for attempted first degree murder, contending that the evidence was insufficient to establish the essential element of premeditation. In order to support a conviction for criminal attempt to commit first degree murder, there must be evidence of a criminal attempt, which, as relevant to this case, is defined as follows:

(a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part . . . .

T.C.A. § 39-12-101(a)(2) (2006). Additionally, the proof must establish that the Appellant acted with premeditation. T.C.A. § 39-13-202(a)(1).

As noted, the Appellant argues that the evidence does not support a finding that he acted with premeditation. Rather, he alleges that the proof indicates that he only shot Atilebawi after being provoked and while in a state of passion. Notwithstanding that the Appellant's own statements reveal that he went to Atilebawi's residence to seek revenge, Atilebawi testified that he was shot from behind, and the medical proof revealed that Atilebawi suffered multiple gunshot wounds to his head. The Appellant asserts that the allegation that his intention was to kill Atilebawi is belied by the fact that, despite the request "to finish Atilebawi off," the Appellant fled the scene leaving Atilebawi alive. Considered in the light most favorable to the State, the proof clearly shows that the Appellant shot the unarmed victim multiple times in the back of the head. The issue of whether the Appellant intended only to inflict serious bodily injury or death upon his unarmed victim is a determination for the jury. From this proof, a reasonable juror could have concluded that the Appellant's actions were intended to result in the death of Atilebawi.

### 4. Especially Aggravated Robbery

The Appellant also challenges the sufficiency of the evidence to support his conviction for the especially aggravated robbery of Hussain Atilebawi. He argues that, because the purpose of the shooting was not to steal the cars, money, or personal items, there exists no causal link between the shooting and the theft necessary to constitute especially aggravated robbery.

Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a) (2006). Especially aggravated robbery is robbery accomplished with a deadly weapon where the victim suffers serious bodily injury. T.C.A. § 39-13-403(a)(1), (2) (2006).

The proof at trial revealed that the Appellant, armed with a weapon, arrived at Atilebawi's residence in need of a vehicle and intent on resolving some financial and personal matters with Atilebawi. The proof also establishes that numerous personal items of Atilebawi's, including clothing, stereo speakers, money, and his Jeep Cherokee, were taken from his household in close temporal proximity to the shooting. The proof further reveals that Atilebawi suffered severe and permanent bodily injury as a result of the robbery. Based on this proof, we

-16-

conclude that a reasonable juror could have found that the State had proven the elements of especially aggravated robbery beyond a reasonable doubt.

### b.  Introduction of Photograph of the Victim

During the testimony of Leonard Porter, a criminal investigator for the District Attorney General's Office, the prosecutor moved to admit a photograph of Atilebawi's injuries.  The photograph, taken the week of the trial, depicted the right side of the victim's head and showed a large scar beginning at his forehead and continuing to the back of his head.  The prosecutor stated that introduction of the photograph was relevant to "show all of these elements of the criminal attempt murder in the first degree. . . ."  She further explained that no photographs of Atilebawi's injuries were taken at either "the crime scene or the hospital because they were trying to save his life. . . ."  The Appellant objected stating that the victim had testified in person and that the photograph failed to prove any element of the crime.  The trial court made the following ruling regarding the admission of the photograph:

> Well, my response to all of what all of you have said would be that as to relevance, it's very relevant.  I mean, there is no question it was relevant.  It shows the horrific nature of the severe injury that this man sustained, and it tends to corroborate what he testified to and what the doctor from The Med testified to.

> It's not prejudicial in that it doesn't show – it's not gory or bloody, and the jury saw him when he was in here yesterday and saw essentially the same injury.  The only – I think the only plausible argument against allowing it in would be that it would be cumulative.  The victim was in here yesterday.

> But I think that the State's burden to prove their case, I think gives them the right to introduce one photograph.  They're not asking to introduce ten or [twenty] but to introduce one photograph that can be shown to the jury to corroborate the injuries that were testified to by the victim himself and by the doctor from The Med . . . [t]o show the injuries in general.  To show that this man was severely injured by the gunshot wounds to the back of the head, that half his head was blown off to show all of those things of course.

The trial court continued:

> . . . It is relevant and it's not prejudicial.  It is perhaps somewhat cumulative but that – for example, had the State offered it into evidence when this victim was on the stand, I would have let them introduce it at that time because I think it's fair to allow at least one photograph of injuries, even though the person is sitting here live at this point in time, to document the record, to remind the jury later in the trial, at closing argument, during deliberations, that this is what this man looks like so that there is an actual photograph of it.

Photographs are always by their nature cumulative to some extent. By definition, a photograph is going to be cumulative of something else. You can always have a person come in and testify to what a photograph otherwise depicts. . . .

. . . And a photograph will provide [the jury] with that documented evidence that they can look at of injuries that they saw in person four or five days earlier. . . .

On appeal, the Appellant contends that the trial court erred in permitting the introduction of the photograph of the surviving victim, arguing that the trial court should have excluded the photograph because of the inevitable danger of unfair prejudice. Additionally, he asserts that the photograph exaggerated the victim's injuries and was irrelevant, as the photograph was taken years after the incident. Finally, the Appellant contends that, since the jury had already seen Atilebawi's injuries during his testimony at trial, the admission of the photograph was prejudicially cumulative. The State responds that the trial court's ruling was proper. Specifically, the State contends that the photograph was relevant to establish the Appellant's intent to murder Atilebawi and that it establishes that Atilebawi suffered serious bodily injury. Both elements are necessary to support convictions of attempted first degree murder and especially aggravated robbery. *See* T.C.A. § 39-13-202, -403. The State also contends that the photograph illustrated the testimony of Dr. Timmons and Atilebawi.

The admission of photographs is generally discretionary with the trial court and, absent an abuse of that discretion, will not result in the grant of a new trial. *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978). However, a photograph must be relevant to an issue that the jury must decide before it may be admitted into evidence. *State v. Vann*, 976 S.W.2d 93, 102 (Tenn. 1998), *cert*. *denied*, 526 U.S. 1071, 119 S. Ct. 1467 (1999); *State v. Braden*, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993); *see also* Tenn. R. Evid. 401, 402. Evidence that is not relevant to prove some part of the prosecution's case should not be admitted solely to inflame the jury and prejudice the defendant. Additionally, the probative value of the photograph must outweigh any unfair prejudicial effect that it may have upon the trier of fact. *Vann*, 976 S.W.2d at 102-03; *see also* Tenn. R. Evid. 403 ("[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice").

While it can be said that photographs of crime victims who suffer serious bodily injury are prejudicial by their very nature, a prejudicial photograph is not *per se* excludable. What is excluded is evidence which is unfairly prejudicial, in other words, evidence which has an undue tendency to suggest a decision on an improper basis, frequently, though not necessarily, an emotional one. *Banks*, 564 S.W.2d at 951.

The trial court determined that the photograph was relevant and not prejudicial. We agree that the photograph was relevant to supplement the testimony of Dr. Timmons, as well as that of the victim himself. *See State v. Cole*, 155 S.W.3d 885, 913 (Tenn. 2005) (Appendix), *cert*. *denied*, ____ U.S. ____, 126 S. Ct. 47 (2005). We also agree that the trial court's acknowledgment of the need to preserve a record for the jury is accurate. Additionally, the photograph in question is not particularly gruesome. Thus, we conclude that the probative value

of the photograph is not outweighed by its prejudicial effect, and the trial court did not abuse its discretion in allowing its admission. Further, it does not affirmatively appear that the "admission of the photograph[] has affected the results of the trial." *See Banks*, 564 S.W.2d at 953. The Appellant is not entitled to relief on this issue.

### c. Admission of the Appellant's Statement

The Appellant next argues that the trial court erred in permitting introduction of statements made by the Appellant without first ruling on the Appellant's motion to suppress those statements. The State responds that the issue is waived because the Appellant failed to pursue the motion to suppress.

The record before this court reflects that the Appellant filed a motion to suppress his statements on July 16, 2003, alleging that his statements were involuntarily given as he was under duress at the time the statements were made. A hearing was conducted on July 25, 2003, during which time the Appellant requested and was granted a continuance until October 31, 2003. As the State correctly asserts, the record is silent as to whether the Appellant actively pursued the motion to suppress after this point. The record does indicate that on April 4, 2005, before voir dire of the jury panel commenced, the Appellant's counsel made the following remarks:

> Judge, I looked through the court jacket this morning, making sure since I was not
> on this case originally or at the time the motions were heard and I believe that all
> motions that have been filed have been discussed and ruled upon except for the
> 608, 609 motion that Your Honor took under advisement. [2]

During the State's case-in-chief, the Appellant's statements to law enforcement officers were admitted without any objection by the Appellant. Additionally, the Appellant, in his motion for new trial, raised the issue of whether the trial court erred in denying the motion to suppress, supporting the conclusion that the motion was in fact denied.

It is clear from the record before this court that, at the trial level, the Appellant proceeded under the assumption that the trial court had denied his motion to suppress. The Appellant, however, now maintains on appeal that he did not abandon the suppression issue. He adds that the fact that the trial court failed to state its findings on the record violated his constitutional rights to due process and to a fair jury trial, in addition to violating Tenn. R. Crim. P. 12(e).

From the actions of the parties and the trial court during the trial, including the failure of the Appellant to object to the introduction of the statements, it appears that all parties believed that the motion to suppress had been denied. Most notably, the trial court's admission of the

[2]It is undisputed that, during the course of the Appellant's representation, certain reassignments in the Public Defender's Office resulted in Attorney Thackery being relieved from this case. Attorney White was appointed in her place. Prior to trial, Attorney White was relieved, resulting in the appointment of Attorney Kent.

statements during the trial suggests that the trial court was under the assumption that it had overruled the Appellant's motion. While the record presently before this court does not contain an order of the trial court reflecting its ruling upon the motion, we cannot conclude that its absence is dispositive. It is the burden of the Appellant to prepare a full and complete record for appellate review. *See* Tenn. R. App. P. 24(b). Moreover, the record clearly reflects that no objection was made by the Appellant to the admission of his statements at trial.

Even assuming for argument's sake that no ruling was ever made by the trial court, it was the Appellant who failed to obtain a ruling on that motion and failed to object when the evidence was introduced at trial. Accordingly, we agree with the State that the Appellant has abandoned the motion by failing to call to the trial court's attention the lack of a ruling on his suppression motion and by failing to object to the admission of the statements at trial. *See* Tenn. R. App. P. 36(a). If a motion is not acted upon, the litigant should renew it. "He may not lull the judge into thinking that it has been abandoned and then, after he has lost, pull a rabbit out of his pocket in the form of a forgotten motion." *United States v. Taglia*, 922 F.2d 413, 416-17 (7th Cir.), *cert. denied*, 500 U.S. 927, 111 S. Ct. 2040 (1991). As noted, the Appellant failed to renew his motion or ask for a ruling prior to voir dire. Later, when the State sought introduction of his statements, the Appellant remained silent and made no objection.

A similar issue was addressed by the Court of Appeals in *Grandstaff v. Hawks*, 36 S.W.3d 482 (Tenn. Ct. App. 2000). In *Grandstaff*, the trial court did not unequivocally overrule a motion in limine. The Court of Appeals determined that the motion in limine should have been renewed by objection and that the failure to renew the motion in limine had waived the issue. In reaching this conclusion, the Court of Appeals held:

> Objections to the introduction of evidence must be timely and specific. *See Overstreet v. Shoney's, Inc.,* 4 S.W.3d 694, 702 (Tenn. Ct. App. 1999). An evidentiary objection will be considered timely either if it is made in a motion in limine or if it is made at the time the objectionable evidence is about to be introduced. *See Wright v. United Servs. Auto. Ass'n,* 789 S.W.2d 911, 914 (Tenn. Ct. App. 1990). A party who files an unsuccessful motion in limine need not renew the motion when the evidence is introduced as long as the trial court "clearly and definitively" overruled the motion in limine when it was made. *See State v. Brobeck,* 751 S.W.2d 828, 833-34 (Tenn. 1988); *State v. McGhee,* 746 S.W.2d 460, 462 (Tenn. 1988); *Wright v. United Servs. Auto. Ass'n,* 789 S.W.2d at 914. If, however, the trial court has not "clearly and definitively" acted on the motion, the moving party must renew the motion contemporaneously with the introduction of the objectionable evidence. Failure to renew the motion will preclude the moving party from taking issue on appeal with the admission of the evidence.

*Grandstaff*, 36 S.W.3d at 488.

Tennessee law is well-established that a party who invites or waives error, or who fails to take reasonable steps to cure an error, is not entitled to relief on appeal. *See* Tenn. R. App. P. 36(a). Moreover, if waived, this court will not consider the issue on appeal unless it is clear from the record that plain error was committed.

The motion to suppress filed by the Appellant on July 15, 2003, presented two allegations in support of his contention that the statements were taken in violation of his constitutional rights, namely that:

1. The [Appellant] did not freely, knowingly and voluntarily give said statements.
2. The [Appellant] made said statements while under duress.

No additional facts or argument were presented in support of the motion. At the July 25, 2003 motion to suppress hearing, Sergeant Mark Miller testified that the Appellant was advised of his rights and signed a waiver of rights form. The Appellant informed Sergeant Miller that he had an eleventh grade education. Sergeant Miller stated that the Appellant understood English and could read and write. In addition to the written waiver, the Appellant verbally indicated that he understood and waived his constitutional rights. Sergeant Miller testified that, at no time, did he threaten, coerce, or make promises to the Appellant.

Sergeant James Fitzpatrick testified that, one day after the Appellant's initial statement, the Appellant informed law enforcement officials that he wanted to change some facts related in his initial statement. Sergeant Fitzpatrick permitted the Appellant to make corrections to the statement. Sergeant Fitzpatrick observed that the Appellant had no problems communicating and appeared to be of sound mind. The Appellant never requested an attorney. Sergeant Fitzpatrick testified that, at no time, did he threaten, coerce, or make promises to the Appellant. He also recalled that the Appellant was permitted to use the restroom during the interview and that the Appellant stopped to eat on two occasions.

Inherent in the admissibility of the written statement is that the statement was voluntarily given by a defendant knowledgeable of his constitutional rights and accompanied by a valid and knowing waiver of those rights. *State v. Berry*, 141 S.W.3d 549, 577 (Tenn. 2004) (quoting *Miranda v. Arizona*, 384 U.S. 436, 467, 86 S. Ct. 1602, 1624 (1966); *State v. Middlebrooks*, 840 S.W.2d 317, 326 (Tenn. 1992), *cert. dismissed*, 510 U.S. 124, 114 S. Ct. 651 (1993)). In determining the admissibility of a confession, the particular circumstances of each case must be examined as a whole. *Berry*, 141 S.W.3d at 577 (citing *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996)). A defendant's subjective perception alone is not sufficient to justify a conclusion of involuntariness in the constitutional sense. *Id*. (citations omitted). The primary consideration in determining the admissibility of the evidence is whether the confession is an act of free will. *Id*. at 578 (citing *State v. Chandler*, 547 S.W.2d 918, 920 (Tenn. 1977)). A confession is not voluntary when "the behavior of the state's law enforcement officials was such as to overbear" the will of an accused and "bring about confessions not freely self-determined." *Id*. (citing *State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980)).

The testimony revealed that the Appellant's communication skills appeared adequate and that he was capable of reading, writing, and comprehension.  The Appellant was advised of his constitutional rights and, without coercion or force, voluntarily waived his rights and provided an inculpatory statement.  Neither officer indicated that the Appellant was under duress at the time he made his two statements.  The officers provided the Appellant with food and restroom breaks during the interview process, and the Appellant never asked for an attorney.  Therefore, we conclude that the Appellant knowingly waived his *Miranda* rights and voluntarily provided the statements to the police.  Thus, the Appellant is not entitled to relief on this issue.

### d. Introduction of Hearsay Statements of Victim

During the trial, the court, over objection by the Appellant, permitted Officer Steven Jones to testify as to statements made by Atilebawi concerning the identity of the shooter.   The following colloquy occurred:

Q:  Officer Jones, when you asked Mr. Atilebawi what happened, what did he tell you?

A:  He told me that a person that he knew as Boo asked to use his phone.  As he was talking on the phone he was acting very suspicious.  And at that time he walked out.  He felt a very sharp pain to his head and to his shoulder and heard a couple pops and he ran back inside the house.

Q:  . . . Who ran back inside the house?

A:  The . . . suspect did . . . .  They were outside talking because he walked back outside with the phone.  And as they ran back inside the house, he felt another – he heard another pop and he felt a sharp pain to his shoulder.

Q:  Okay.  And when you say "he heard the pop," are you talking about the victim in this case Mr. Atilebawi?

A:  Yes, ma'am.

        . . . .

Q:  Did you ask Mr. Atilebawi at that time to describe this person named Boo?

A:  Yes, ma'am, we did.

Q:  What did he tell you?

A:  Said it was a male black, late teens, early twenties.

Q: Did he know another name?

A: No, he actually did not know another name. He said he knew him as Boo only.

On appeal, the Appellant asserts that these statements were improperly admitted under the excited utterance exception. The Appellant contends that the hearsay statements made by Atilebawi do not fall under the excited utterance exception, as Atilebawi did not spontaneously utter the statements. Rather, the statements were made in response to questioning by Officer Jones. Additionally, he argues that the "event" had not just occurred, asserting that it appeared that the statements were not made until at least five hours after the incident. Similarly, the Appellant contends that the statements do not fall under the dying declaration exception, as Atilebawi was available for trial and had, in fact, already testified. Moreover, he argues that there is no indication that the declarant believed that his death was imminent when the statements were made.

### 1. Standard of Review

Questions concerning the admissibility of evidence generally rest within the sound discretion of the trial court. *State v. Maclin*, 183 S.W.3d 335, 342 (Tenn. 2006). With the discretion afforded to the trial court, this court will not interfere with the trial court's ruling absent a clear abuse appearing on the face of the record. *Id.* (citations omitted). Notwithstanding this standard, the question of whether the admission of the hearsay statements violated a defendant's rights under the Confrontation Clause is purely a question of law. *Id.* at 342-43 (citing *Lilly v. Virginia*, 527 U.S. 116, 125, 119 S. Ct. 1887, 1894 (1999)); *see also Abdur' Rahman v. Bredesen*, 181 S.W.3d 292 (Tenn. 2005) (stating that "[a] constitutional claim that is resolved after an evidentiary hearing generally presents a mixed question of law and fact"). The application of the law to the facts found by the trial court is a question of law that this court reviews *de novo*. *Maclin*, 183 S.W.3d at 343 (citing *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997); *Beare Co. v. Tenn. Dep't of Revenue,* 858 S.W.2d 906, 907 (Tenn. 1993)).

### 2. Crawford v. Washington: Confrontation

The Appellant claims that the challenged statements were not admissible under hearsay exceptions and violated his rights under the Confrontation Clause. The United States Supreme Court held, in *Crawford v. Washington,* 541 U.S. 36, 124 S. Ct. 1354 (2004), that the Confrontation Clause bars admission of testimonial out-of-court statements unless the witness is unavailable and the defendant has had a prior opportunity for cross-examination. Thus, even if a hearsay exception applies to an out-of-court statement, the statement is not admissible if it is testimonial and the defendant has not been afforded the opportunity to cross-examine the declarant regarding the statement. *Crawford*, 541 U.S. at 68; 124 S. Ct. at 1374 (2004). The Court clarified that the Confrontation Clause "applies to 'witnesses' against the accused – in other words, those who 'bear testimony.'" *Id.* at 51, 124 S. Ct. at 1364.

### 3. Testimonial v. Non-Testimonial Statements

The initial inquiry focuses on whether the particular statement is testimonial or non-testimonial in nature. *Id*. If the statement is non-testimonial in nature, consistent with *Ohio v. Roberts*, 448 U.S. 56, 100 S. Ct. 2531 (1980), the court must determine whether the out-of-court statement bears adequate indicia of reliability, specifically whether it falls within a "firmly rooted hearsay exception" or bears "particularized guarantees of trustworthiness." *Roberts*, 448 U.S. at 66, 100 S. Ct. at 2539. If it is testimonial, the statement is inadmissible unless: (1) the declarant is unavailable; and (2) the accused had a prior opportunity to cross-examine the declarant.

The *Crawford* decision did not spell out a comprehensive definition of the word testimonial. However, the Court did provide that "it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." *Crawford*, 541 U.S. at 68, 124 S. Ct. at 1374.

In March of 2006, the United States Supreme Court's decision in *Davis v. Washington*, ___ U.S. ___, 126 S. Ct. 2266 (2006), further distinguished between testimonial and non-testimonial statements in the limited context of police interrogations, with the following language:

> Statements are non-testimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

___ U.S. ___, 126 S. Ct. at 2273-74. The *Davis* Court further explained that, "[i]t is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." *Id*. at ___, 126 S. Ct. At 2273.

In *Maclin*, the Tennessee Supreme Court provided the following factors to consider when deciding whether a particular statement is testimonial:

> (1) whether the declarant was a victim or an observer; (2) whether contact was initiated by the declarant or by law-enforcement officials; (3) the degree of formality attending the circumstances in which the statement was made; (4) whether the statement was given in response to questioning, whether the questioning was structured, and the scope of such questioning; (5) whether the statement was recorded (either in writing or by electronic means); (6) the declarant's purpose in making the statements; (7) the officer's purpose in speaking

with the declarant; and (8) whether an objective declarant under the circumstances would believe that the statements would be used at a trial.

*Maclin*, 183 S.W.3d at 349. Our supreme court noted that this "list is not exhaustive; other considerations may also be meaningful depending on the particular facts of the case." *Id*. The *Maclin* decision also explained that the language of *Crawford* points to the following objective standard for determining whether a particular witness's statement is testimonial: "[W]hether the statement was made 'under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" *Id*. at 349. In other words, "[t]he primary consideration under such an approach remains whether the declarant was acting as a 'witness'-that is, 'bearing testimony' against the accused." *Id*. at 351. In this regard, our supreme court adopted the definition of "testimony" articulated by the Supreme Court in *Crawford*: "'[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Crawford,* 541 U.S. at 51, 124 S. Ct. at 1364 (citations omitted). *Crawford* emphasized that the types of statements the Court considered "testimonial" were those formal types of statements, including those made in a police interrogation, that a reasonable declarant would expect to be used prosecutorially or at trial. *Id*. at 51-52, 124 S. Ct. at 1364.

### 4. Officer Jones' Testimony

At 6:55 a.m., Officer Jones was the first officer to arrive at the crime scene, but the shooting had occurred several hours prior to his arrival. No ongoing emergency prevailed at the time of Officer Jones' questions to the victim. Atilebawi's statements were made in response to questioning by Officer Jones. Like the statements labeled as testimonial by the *Davis* Court, Atilebawi's statements "were neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation." *See Davis,* ___ U.S. ___, 126 S. Ct. at 2279. Officer Jones clearly questioned the victim in order to learn about past conduct and not in order to address an instantaneous emergency. Thus, it appears that the victim's statements offered into evidence through Officer Jones' testimony were testimonial in nature. Notwithstanding, under the *Crawford* definition of testimonial, we are unable to conclude that the victim, after suffering two gunshot wounds to the head, offered the statements under the objective belief that they would be prosecutorially used against the Appellant's at trial.

### 5. Analysis Under Crawford v. Washington

When the declarant testifies at trial and is available for cross-examination, the Confrontation Clause places no constraints at all on the use of the declarant's prior testimonial statements. *Crawford*, 541 U.S. at 59 n.9, 124 S. Ct. at 1369 n.9. *Crawford* only bars the admission of testimonial statements of a witness who is unavailable to testify at trial and whom the defendant has had no prior opportunity to cross-examine. In this case, the victim Atilebawi testified at trial and was subject to cross-examination by the Appellant. Thus, the Sixth Amendment Confrontation Clause does not bar admission of Officer Jones' testimony with regard to Atilebawi's statements.

### 6. Hearsay Exceptions- Excited Utterance

Because the admission and exclusion of evidence falls within the sound discretion of the trial court, we review the admission of evidence only for abuse of discretion. *State v. James*, 81 S.W.3d 751, 760 (Tenn. 2002). "An appellate court should find an abuse of discretion when it appears that the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *Id.* (internal quotations omitted).

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). In general, hearsay statements are inadmissible. Tenn. R. Evid. 802 ("Hearsay is not admissible except as provided by these rules or otherwise by law."). However, the rules of evidence provide an exception to the hearsay rule allowing hearsay statements to be admissible if they meet the conditions of an "excited utterance." Tenn. R. Evid. 803(2). An excited utterance is a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." *Id.* The rationale for admitting an "excited utterance" is that the perceived event produces nervous excitement, which temporarily suspends the capacity to reflect, making the fabrication of statements about that event unlikely. *State v. Gordon*, 952 S.W.2d 817, 819 (Tenn. 1997) (citations omitted). In addition, a statement relating to a startling event is typically made while the memory of the circumstance or event is still fresh, thus creating a more accurate testimonial to the event than would be produced by a later in-court description of it. *Id.* at 819-20.

In order to meet the parameters of the "excited utterance" exception: (1) there must be a startling event or condition that causes the stress of excitement; (2) the statement must relate to the startling event or condition; and (3) the statement must be made while the declarant was under the stress of excitement caused by the event or condition. *State v. Stout*, 46 S.W.3d 689, 699-700 (Tenn. 2001), *superseded by statute on other grounds as stated in State v. Odom*, 137 S.W.3d 572 (Tenn. 2004); *Gordon*, 952 S.W.2d at 820. The ultimate issue is whether the statement is deemed reliable because of its spontaneity and lack of thoughtful reflection and deliberation.

The Appellant contends that the victim's statements to Officer Jones do not fall within the excited utterance exception because they did not occur so close in time to be made while the declarant, Atilebawi, was under the stress of excitement caused by the event. He also contends that the statements were not uttered spontaneously but, rather, were made in response to Officer Jones' questioning. For these reasons, the Appellant asserts that "the victim did not make the statement[s] while still under the stress of a startling event."

The State contends that the excited utterance hearsay exception was met because Officer Jones observed that Atilebawi was in a "dazed, confused state." Officer Jones testified that Atilebawi was in shock and was "very disoriented." The State also cites the fact that Atilebawi

sustained two gunshot wounds to his head. Accordingly, the State argues that the Appellant was still under the stress caused by the shooting and his resulting injuries.

The amount of time that has passed between the event and the statement is not dispositive. Rather, the issue for consideration is whether the declarant was still under the stress of excitement caused by the startling event when the statement was made. Other relevant circumstances to consider include the nature and seriousness of the event or condition; the appearance, behavior, outlook, and circumstances of the declarant, including such characteristics as age and physical or mental condition; and the contents of the statement itself, which may indicate the presence or absence of stress. *State v. Smith*, 868 S.W.2d 561, 574 (Tenn. 1993). Thus, contrary to the Appellant's argument, the lapse of time between the startling event and the declarant's statement does not necessarily preclude a finding that the statement was a spontaneous response to the event or that the declarant's stress of excitement had not diminished. *See State v. Binion*, 947 S.W.2d 867 (Tenn. Crim. App. 1996); *see also Stout*, 46 S.W.3d at 689 (because the court had considered all the relevant factors, including the time span between the event and the statement, it was not an abuse of discretion for the trial court to determine that statements made twelve hours after the event were admissible as excited utterances where the declarant continued to be under the stress of the event). Here, the trial court properly determined that Atilebawi was still under the stress or excitement of the shooting.

We next address whether the fact that Atilebawi's statements were not spontaneous, but rather were made in response to questioning by Officer Jones, precludes them being excited utterances. A statement is not automatically precluded from the excited utterance exception merely because it is made in response to a question. Rather, the pertinent inquiry is whether the statement was made under the "excitement or stress of the event," taking into consideration the fact that the statement was in response to a question. *Gordon*, 952 S.W.2d at 820-21 (citing *State v. Smith,* 857 S.W.2d 1, 9 (Tenn. 1993) ("statements made in response to questions may still be admissible if the declarant is under the excitement or stress of the event"). In the present case, Officer Jones was the first officer to arrive at the scene after the victims had been shot. Officer Jones testified that Atilebawi was "dazed," "confused," and "very disoriented" as a result of receiving two gunshot wounds to the head. When Officer Jones asked Atilebawi who shot him, Atilebawi identified a young African-American male, known to him as "Boo," as the shooter. Further investigation identified the Appellant as "Boo." We agree with the trial court that this statement was certainly made under the stress of a startling event, notwithstanding the fact that police questioning elicited the statement. As such, we conclude that the trial court properly admitted the victim's statement as an excited utterance.

**7. Harmless Error**

Finally, regardless of whether Officer Jones' testimony fell under the excited utterance exception to the hearsay rule, the introduction of the statement, even if error, was harmless. The admission of hearsay is not grounds for reversal where it is merely cumulative of other evidence admitted. *See* Tenn. R. Crim. P. 52(a); *see also Newcomb v. Kohler Co.*, ___ S.W.3d ___ (Tenn.

-27-

Ct. App. 2006), *perm. app. denied*, (Tenn. 2007). Officer Jones' testimony related the fact that the victim, Atilebawi, identified the Appellant as the perpetrator. During the trial, Atilebawi testified and identified the Appellant as the perpetrator. Thus, Officer Jones' testimony was merely cumulative of Atilebawi's testimony at trial. Moreover, the Appellant provided a statement in which he admitted his actions involving the shooting of the two victims. Clearly, Officer Jones' testimony regarding Atilebawi's statements was merely cumulative evidence. The Appellant's convictions were supported by substantial independent evidence of guilt as to satisfy us that there was no substantial likelihood that the alleged hearsay evidence contributed to the conviction. Thus, even if error, the trial court's admission of the hearsay testimony was harmless.

### e. Certification of Arabic Language Interpreter

The trial court appointed an Arabic language interpreter at trial. The Appellant argues that: (1) there is no indication that the interpreter was registered or certified as a language interpreter by the Tennessee Administrative Office of the Courts; and (2) the trial court failed to make the mandated findings under Tenn. R. Sup. Ct. 42, § 3(e) before appointing a non-credentialed interpreter and failed to summarize efforts made to obtain a certified interpreter and to determine the capabilities of the non-credentialed interpreter in open court. The Appellant asserts that these failures violated his federal and state rights to cross-examine the witness, to due process, and to a fair trial. The State responds that the record reflects that the interpreter is a state-certified court interpreter. Moreover, the State asserts that the Appellant has waived the issue by failing to raise any objection to the interpreter's qualifications at trial or in his motion for new trial. *See* Tenn. R. App. P. 3(e), 36(a).

The State is correct that the record reflects that no objection was made by the Appellant to the qualifications of the interpreter at trial and that the Appellant failed to raise the issue in his motion for new trial. Thus, the Appellant has waived his right to challenge this issue on appeal. *See State v. Cole*, 155 S.W.3d 885, 915 (Tenn. 2005); *State v. McKinney*, 74 S.W.3d 291, 303 n.5 (Tenn. 2002). Notwithstanding waiver, the record does reflect that the trial court noted that the interpreter was a state-certified interpreter. Specifically, the following colloquy occurred:

THE COURT: And let me ask a couple of questions of you for the record. Your name is Mr. Ghanem; correct?

THE INTERPRETER: Yes.

THE COURT: You are certified by the State of Tennessee as a translator/interpreter for court proceedings; is that correct?

THE INTERPRETER: Yes. Yes, Your Honor.

THE COURT: And specifically in Arabic language?

THE INTERPRETER:  Yes.

THE COURT:  And in a variety of dialects of the Arabic language; correct?

THE INTERPRETER: Yes, sir.

THE COURT:  Including the Iraqi language and dialect and idioms and related matters?

THE INTERPRETER: I have record here also in the state of Shelby County of doing this for over 15 years.

Following this colloquy, Alladin Ghanem was sworn by the court as the Arabic interpreter for trial.

Section 3, Rule 42 of the Rules of the Tennessee Supreme Court, provides, in relevant part:

(a) Appointing an interpreter is a matter of judicial discretion. It is the responsibility of the court to determine whether a participant in a legal proceeding has a limited ability to understand and communicate in English.

(b) Recognition of the need for an interpreter may arise from a request by a party or counsel, the court's own voir dire of a party or witness, or disclosures made to the court by parties, counsel, court employees or other persons familiar with the ability of the person to understand and communicate in English.

(c) The court shall appoint an interpreter according to the preference listed below:

1. State certified court interpreter;
2. State registered court interpreter;
3. Non-credentialed court interpreter.

(d) The court may appoint an interpreter of lesser preference (i.e., registered instead of certified or non-credentialed instead of registered) only upon a finding that diligent, good faith efforts to obtain the certified or registered interpreter, as the case may be, have been made and none has been found to be reasonably available.  A non-credentialed interpreter may be appointed only after the court has evaluated the totality of the circumstances including the gravity of the judicial proceeding and the potential penalty or consequence involved.

(e) Before appointing a non-credentialed interpreter, the court shall make the following findings:

> (i) that the proposed interpreter appears to have adequate language skills, knowledge of interpreting techniques, familiarity with interpreting in a court setting; and

> (ii) that the proposed interpreter has read, understands, and will abide by the Rules of Ethics for Spoken Foreign Language Interpreters in Tennessee Courts.

(f) A summary of the efforts made to obtain a certified or registered interpreter and to determine the capabilities of the proposed non-credentialed interpreter shall be made in open court.

(g) The court shall use the services of multiple interpreters where necessary to aid interpretation of court proceedings.

After review of the voir dire of the proffered interpreter, we conclude that the mandates of Tenn. R. Sup. Ct. 42 were sufficiently met. By appointing a certified interpreter, the trial court was not required to comply with the conditions of subsections (e) and (f). The Appellant is not entitled to relief on this issue.

### f. Failure to Properly Instruct on Lesser Included Offenses

Next, the Appellant argues that the trial court erred by failing to charge all lesser included offenses. Specifically, he asserts that: (1) with regard to his indictment for premeditated first degree murder, the trial court failed to instruct on the lesser offenses of criminally negligent homicide, attempted first degree murder, attempted second degree murder, attempted voluntary manslaughter, and reckless endangerment; (2) as to the charge of felony murder, the trial court failed to instruct upon the offenses of facilitation to commit second degree murder, voluntary manslaughter, facilitation of voluntary manslaughter, facilitation of reckless homicide, criminally negligent homicide, facilitation of criminally negligent homicide, and reckless endangerment; (3) as to the charge of criminal attempt to commit first degree murder, the trial court failed to instruct upon the offenses of intentional or knowing aggravated assault, facilitation of aggravated assault, attempted aggravated assault, assault, and misdemeanor reckless endangerment; and (4) as to the charge of especially aggravated robbery, the trial court failed to instruct upon the offenses of attempted especially aggravated robbery, attempted aggravated robbery, attempted robbery, solicitation to commit any of the above lesser included offenses, theft of property, and aggravated assault.

The question of whether a given offense should be submitted to the jury as a lesser included offense is a mixed question of law and fact. *State v. Rush*, 50 S.W.3d 424, 427 (Tenn. 2001) (citing *State v. Smiley*, 38 S.W.3d 521 (Tenn. 2001)). The standard of review for mixed questions of law and fact is *de novo* with no presumption of correctness. *Id*.; *see also State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999).

"In applying the lesser-included offense doctrine, three questions arise: (1) whether an offense is a lesser-included offense; (2) whether the evidence supports a lesser-included offense instruction; and (3) whether an instructional error is harmless." *State v. Allen*, 69 S.W.3d 181, 187 (Tenn. 2002). In *Burns*, our supreme court adopted a modified version of the Model Penal Code in order to determine what constitutes a lesser included offense, finding that an offense is a lesser included offense if:

(a) all of its statutory elements are included within the statutory elements of the offense charged; or

(b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element establishing:

(1) a different mental state indicating a lesser kind of culpability; and/or

(2) a less serious harm or risk of harm to the same person, property or public interest; or

(c) it consists of

(1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

(2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

(3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

*Burns*, 6 S.W.3d at 466-67. If an offense is a lesser included offense of the charged offense, the trial court must then determine whether the record contains any evidence which reasonable minds could accept as to the lesser included offense and whether the evidence is legally sufficient to support a conviction of the lesser included offense. T.C.A. § 40-18-110(a) (2006). In making

-31-

these determinations, the trial court must consider the evidence liberally in the light most favorable to the existence of the lesser included offense without making any judgment on the credibility of such evidence. *Id*.

The failure to instruct the jury on lesser included offenses requires a reversal for a new trial unless a reviewing court determines that the error was harmless beyond a reasonable doubt. *State v. Ely*, 48 S.W.3d 710, 727 (Tenn. 2001). In making this determination, the reviewing court must "conduct a thorough examination of the record, including the evidence presented at trial, the defendant's theory of defense, and the verdict returned by the jury." *Allen*, 69 S.W.3d at 191.

### 1. Premeditated First Degree Murder

The Appellant contends that the trial court erred by failing to instruct the jury as to the lesser offenses of: (1) attempted first degree murder; (2) attempted second degree murder; (3) attempted voluntary manslaughter; (4) criminally negligent homicide; and (5) reckless endangerment. The State responds that the Appellant has waived consideration of these offenses, with the exception of the offenses of criminally negligent homicide and reckless endangerment, because the Appellant failed to request a written instruction on these offenses and because he failed to preserve the issue in his motion for new trial. *See State v. Page*, 184 S.W.3d 223 (Tenn. 2006); Tenn. R. App. P. 3(e).

In the Appellant's written request for jury instructions on lesser offenses, he specifically requested that instructions be given on the following lesser offenses of premeditated first degree murder: facilitation of first degree murder, second degree murder, facilitation of second degree murder, voluntary manslaughter, facilitation of voluntary manslaughter, reckless homicide, criminally negligent homicide, and reckless endangerment. During the trial, the trial court made the following remarks regarding lesser offenses of premeditated first degree murder:

> . . . I am planning on charging facilitation of first degree murder, second degree murder, facilitation of second degree murder, voluntary manslaughter. I hadn't planned on charging facilitation to commit voluntary manslaughter because . . . I'm not sure how you would do that from just an intellectual standpoint. Explain to me how, given what the definition of voluntary manslaughter is, how you could facilitate someone else in the commission of a voluntary manslaughter . . . .[3]
>
> . . . .
>
> . . . Then I am going to charge reckless homicide. I hadn't planned on charging criminally negligent homicide. . . . I'm still trying to figure out how the proof in

---

[3] The Appellant subsequently withdrew the request for an instruction on facilitation of voluntary manslaughter, noting that "that's one I left in [by] accident."

this case with this man lying face down . . . and shot in the back of the head within 24 inches, how that can be criminally negligent homicide. . . .

. . . .

. . . But there is nothing in the proof that I can recall that comes close to that type of factual scenario, nothing in the physical evidence, nothing in either of the [Appellant's] two statements if you were to believe – regardless of which one you were to believe, I just don't see any facts in this case that would in any way warrant charging criminally negligent homicide.

. . . .

And so I'm just not going to do it. I just feel that it's putting something before the jury for throwing it in front of them when there is – are absolutely no facts whatsoever under the interpretation of the proof in the light most favorable to the [Appellant], no facts whatsoever that would warrant . . . giving that charge. . . .

And reckless endangerment as in when somebody doesn't even die but reckless endangerment?

### a. Waiver of Attempted Homicides

We initially observe that at the time of the Appellant's trial, absent a written request for an instruction on lesser included offenses, the failure of the trial court to instruct the jury on any lesser included offense was not available as a ground for relief either in a motion for new trial or for plenary review on appeal. T.C.A. § 40-18-110(c); *Page*, 184 S.W.3d at 230. The Appellant failed to file a written request for the offenses of attempt to commit first degree murder, attempt to commit second degree murder, and attempt to commit voluntary manslaughter.

Our supreme court has held that "the waiver of a lesser-included offense for purposes of plenary appellate review is constitutionally permissible." *Page*, 184 S.W.3d at 230; *see also State v. Vasques*, ___ S.W.3d ___ (Tenn. 2007); *State v. Wilson*, 211 S.W.3d 714, 720 (Tenn. 2007). Our supreme court observed that "[a]s a non-structural constitutional error, the omission of a lesser-included offense instruction is subject to waiver for purposes of plenary appellate review when the issue is not timely raised and properly preserved." *Page*, 184 S.W.3d at 230.

Irrespective of section 40-18-110, a defendant has a constitutional right to a correct and complete charge of the law to ensure that he receives a fair trial. *Wilson*, 211 S.W.3d at 720; *State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990). The review of the trial court's failure to instruct the jury on lesser included offenses, even when not requested in writing, proceeds under a plain error analysis. *Page*, 184 S.W.3d at 230-31.

Rule 52(b) of the Tennessee Rules of Criminal Procedure provides that "plain error" is "an error which has affected the substantial rights of an accused," and, when necessary to do substantial justice, an appellate court may consider such an error "at any time, even though not raised in the motion for a new trial or assigned as error on appeal." When determining whether such plain error review is appropriate, the following factors must be established:

(a) the record must clearly establish what occurred in the trial court;

(b) a clear and unequivocal rule of law must have been breached;

(c) a substantial right of the accused must have been adversely affected;

(d) the accused [must not have waived] the issue for tactical reasons; and

(e) consideration of the error [must be] "necessary to do substantial justice."

*State v. Terry*, 118 S.W.3d 355, 360 (Tenn. 2003) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). In addition, "[a]ll five factors must be established by the record" before an appellate court may "recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id*. (citing *Smith*, 24 S.W.3d at 283).

We hold that the trial court's failure to submit charges on attempted first degree murder, attempted second degree murder, and attempted voluntary manslaughter is not plain error. It is without dispute that the victim, Al-Maily, died as a result of the gunshot wound to the back of his head. It is also without dispute that either the Appellant or Michael Hilliard shot Al-Maily. The only issue for the jury to determine was whether the Appellant did or did not shoot and kill Al-Maily. Based on the proof at trial, no reasonable juror could have concluded that the Appellant "attempted" any form of homicide, as the act was completed. *See generally State v. Wilson*, 92 S.W.3d 391, 396 (Tenn. 2002).

### b. Criminally Negligent Homicide

The Appellant asserts that criminally negligent homicide is a lesser offense of first degree premeditated murder. He contends that an instruction of the lesser offense is warranted even if it is inconsistent with the theory of either the State or the defense. The State concedes that the trial court should have granted the Appellant's written request and instructed the jury on criminally negligent homicide because, under *Burns*, it is clear that criminally negligent homicide is a lesser included offense of first degree murder. *Burns*, 6 S.W.3d at 466-67; *see also Ely*, 48 S.W.3d at 727; *State v. Sims*, 45 S.W.3d 1, 21 (Tenn. 2001) (appendix).

Having concluded that the trial court erred in failing to instruct the jury on the lesser offense of criminally negligent homicide, we must decide if the error was harmless beyond a

reasonable doubt.  Reversal of the Appellant's conviction is required unless we conclude "beyond a reasonable doubt that the error did not affect the outcome of the trial."  *See Allen*, 69 S.W.3d at 189.  In *Allen*, our supreme court stated:

> When a lesser-included offense instruction is improperly omitted, we conclude that the harmless error inquiry is the same as for other constitutional errors: whether it appears beyond a reasonable doubt that the error did not affect the outcome of the trial.  In making this determination, a reviewing court should conduct a thorough examination of the record, including the evidence presented at trial, the defendant's theory of defense, and the verdict returned by the jury.  A reviewing court may find the error harmless because the jury, by finding the defendant guilty of the highest offense to the exclusion of the immediately lesser offense, necessarily rejected all other lesser-included offenses.  Harmless error is not limited, however, to such cases.

*Id*. at 191 (citations omitted).  Additionally, in deciding whether it was harmless beyond a reasonable doubt not to charge a lesser included offense, the reviewing court must determine whether a reasonable jury *would* have convicted the defendant of the lesser included offense instead of the charged offense.  In other words, the reviewing court must determine whether it appears beyond a reasonable doubt that the trial court's failure to instruct on the lesser included offense did not affect the outcome of the trial.  *State v. Richmond*, 90 S.W.3d 648, 662 (Tenn. 2002) (citing *Allen*, 69 S.W.3d at 191).

In the present case, the Appellant has failed to prove prejudice resulting from the trial court's error in not charging criminally negligent homicide, as the jury found the Appellant guilty of the higher offense to the exclusion of the intervening lessers.  *See State v. Williams*, 977 S.W.2d 101, 105 (Tenn. 1998).  Moreover, criminally negligent homicide is defined as "[c]riminally negligent conduct which results in death."  T.C.A. § 39-13-212(a) (2006).  To be criminally negligent, a defendant must fail to perceive a substantial and unjustifiable risk.  T.C.A. § 39-11-106(a)(4) (2006).  The Appellant placed a gun to the back of the victim's head and fired. It is inconceivable that the jury would have convicted the Appellant of criminally negligent homicide rather than first degree murder.  Thus, we conclude that the trial court's failure to instruct the jury on criminally negligent homicide was harmless beyond a reasonable doubt.

### c. Reckless Endangerment

The Appellant makes no argument regarding the lower court's failure to instruct the jury on the offense of reckless endangerment.  Accordingly, this issue is waived.  *See* Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27.

### 2. First Degree Felony Murder

The Appellant contends that the trial court erred by failing to instruct the jury as to the lesser offenses of: (1) facilitation of second degree murder; (2) voluntary manslaughter; (3) facilitation of voluntary manslaughter; (4) facilitation of reckless homicide; (5) criminally negligent homicide; (6) facilitation of criminally negligent homicide; and (7) reckless endangerment. Additionally, he asserts that the trial court failed to charge the requisite attempt offenses. The State responds that the Appellant has waived consideration of these offenses, with the exception of the offenses of facilitation of second degree murder and criminally negligent homicide, because the Appellant failed to request a written instruction on these offenses and because he failed to preserve the issue in his motion for new trial. *See Page*, 184 S.W.3d at 223; Tenn. R. App. P. 3(e).

In the Appellant's written request for jury instructions on lesser offenses, he specifically requested that instructions be given on the following lesser offenses of first degree felony murder:  facilitation of felony murder, second degree murder, facilitation of second degree murder, reckless homicide, and criminally negligent homicide. Additionally, during the trial, the Appellant orally requested an instruction on voluntary manslaughter. The trial court made the following pronouncements regarding lesser offenses of first degree felony murder:

> . . . On the count two . . . the murder perp, facilitation to commit murder perp, murder second and reckless homicide. I'm not charging criminally negligent for the same reason that we've already discussed.
>
>     . . . .
>
> And I'm not charging facilitation to commit murder in the second degree as I am in the first count because there is some case law that says in a murder perp count, you don't do that. . . .
>
>     . . . .
>
> You don't charge voluntary in a murder perp situation either. . . .
>
>     . . . .
>
> . . . So I'm charging . . . murder perp, facilitation to commit murder perp, murder second and reckless are the lesser[s] of count two.

### a. Waived Offenses

The Appellant failed to file a written request for the offenses of facilitation of voluntary manslaughter, facilitation of reckless homicide, facilitation of criminally negligent homicide, and reckless endangerment. The Appellant also failed to file a request for any attempt offenses. Accordingly, consideration on appeal of these offenses is waived. The review of the trial court's

failure to instruct the jury on lesser included offenses, even when not requested in writing, proceeds under a plain error analysis. *Page*, 184 S.W.3d at 230-31. In the instant case, the Appellant was convicted of first degree murder committed during the perpetration of a robbery. The victim is deceased; accordingly, we cannot conclude that the failure to instruct on the inchoate offense of attempt constitutes plain error. Additionally, the jury was instructed as to the offense of facilitation of felony murder. Clearly, the jury rejected the theory that the Appellant was merely a facilitator, as well as rejecting lesser forms of homicide. We also cannot conclude that the trial court's failure to instruct on facilitation constituted plain error.

### b. Facilitation of Second Degree Murder

The Appellant asserts that facilitation of second degree murder is a lesser offense of first degree felony murder.[4] We would agree that facilitation of second degree murder is a lesser included offense of second degree murder under part (c) of the test set forth by our supreme court in *Burns*. *See Burns*, 6 S.W.3d at 467. Facilitation of a felony is a lesser degree of criminal responsibility for the conduct of another. *Id*. at 470. However, facilitation presents a separate and distinct theory of criminal liability, as opposed to one charged as a principal offender. *State v. Jared Michael Christein*, No. E2001-01856-CCA-R3-CD (Tenn. Crim. App., at Knoxville, Mar. 4, 2003). In the instant case, the jury rejected the charge of second degree murder and convicted the Appellant of the higher charged offense of felony murder. Thus, the jury found the Appellant guilty of the higher offense to the exclusion of the intervening lessers. *See Williams*, 977 S.W.2d at 105-06. Accordingly, we conclude that the trial court's failure to instruct the jury on facilitation of second degree murder was harmless beyond a reasonable doubt.

### c. Voluntary Manslaughter

The Appellant argues that voluntary manslaughter is a lesser offense of first degree felony murder.[5] The State concedes that this crime is a lesser offense of first degree felony murder and should have been submitted to the jury but argues that the error is harmless beyond a reasonable doubt. We agree. When a lesser included offense instruction is improperly omitted, such error may be deemed harmless if it appears beyond a reasonable doubt that the error did not affect the outcome of the trial. *State v. Richmond*, 90 S.W.3d 648, 662 (Tenn. 2002). In making a harmless error inquiry, a reviewing court does not become a second jury determining whether the defendant is guilty. *Allen*, 69 S.W.3d at 191 (citations omitted). Rather, the court asks whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element. If the answer to that question is "no," then holding the error harmless does not "reflect a denigration of the constitutional rights involved." On the contrary, it "serve[s] a very useful purpose insofar as [it] block[s] setting aside convictions for small errors or defects that

---

[4]The Appellant fails to make a specific argument regarding the failure to instruct on the offense of facilitation of second degree murder as a lesser offense of felony murder.

[5]The Appellant fails to make a specific argument regarding the failure to instruct on the offense of voluntary manslaughter, nor does he make a specific argument as to why the omission of said instruction is not harmless.

have little, if any, likelihood of having changed the result of the trial." *Id.* (citing *State v. Ducker*, 27 S.W.2d at 899 (quoting *Neder v. United States*, 527 U.S. 1, 18-19, 119 S. Ct. 1827, 1838-39 (1999) (citations omitted))).

Voluntary manslaughter is the "intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-211(a) (2006). The Appellant is correct that voluntary manslaughter is a lesser included offense of felony murder. *See generally State v. Marlon Marktavias Fitzgerald*, No. W2001-03096-CCA-R3-CD (Tenn. Crim. App., at Jackson, Feb. 7, 2003), *perm. app. denied*, (Tenn. July 7, 2003); *State v. Alfonzo Williams*, W2001-00452-CCA-R3-CD (Tenn. Crim. App., at Jackson, Mar. 15, 2002), *perm. app. denied*, (Tenn. Sept. 23, 2002) (citing *State v. Daniel Wade Wilson*, No. E2000-01885-CCA-R3-CD (Tenn. Crim. App., at Knoxville, Aug. 2, 2001), *perm. app. denied*, (Tenn. Mar. 11, 2002)). The elements which distinguish voluntary manslaughter from either first or second degree murder are those of "adequate provocation" and the "state of passion."

The proof relative to the murder of Kadhem Al-Maily reveals that the Appellant ordered Al-Maily to the bedroom and, while the victim was laying face down on the floor, covered him with a blanket and shot him in the head. There is absolutely no evidence in the record to support an argument that Al-Maily ever "provoked" the Appellant, which is, as noted, an essential element of the crime of manslaughter. *See* T.C.A. § 39-13-211(a). Rather, the record establishes that the murder of Al-Maily was accomplished in the absence of passion or provocation. Indeed, the Appellant indicated that he was surprised to find Al-Maily at Atilebawi's residence. In light of the evidence presented, we are unable to conclude that the jury would have found the Appellant guilty of voluntary manslaughter had they been so instructed. The trial court's failure to instruct the jury on voluntary manslaughter was, thus, harmless beyond a reasonable doubt. Accordingly, the Appellant is not entitled to relief on this issue.

### d. Criminally Negligent Homicide

The Appellant asserts that criminally negligent homicide is a lesser offense of first degree felony murder.[6] He contends that an instruction of the lesser offense is warranted even if it is inconsistent with the theory of either the State or the defense. The State concedes that the trial court should have granted the written request and instructed the jury on criminally negligent homicide, as criminally negligent homicide is a lesser included offense of felony murder under part (b) of the *Burns* test. *Ely*, 48 S.W.3d at 721-22.

Having concluded that the error occurred, we, in turn, must decide if the error was harmless beyond a reasonable doubt. After review, we conclude that the Appellant has failed to

---

[6]The Appellant fails to make a specific argument regarding the failure to instruct on the offense of criminally negligent homicide as a lesser offense of felony murder, nor does he make a specific argument as to why the omission of said instruction is not harmless.

establish prejudice resulting from the trial court's error in refusing to charge criminally negligent homicide because the jury found the Appellant guilty of the higher offense to the exclusion of the intervening lessers. *See Williams*, 977 S.W.2d at 105-06. Thus, we conclude that the trial court's failure to instruct the jury on criminally negligent homicide was harmless beyond a reasonable doubt.

### 3. Attempt to Commit First Degree Murder

The Appellant contends that the trial court erred by failing to instruct the jury as to the lesser offenses of: (1) intentional aggravated assault; (2) knowing aggravated assault; (3) facilitation of aggravated assault; (4) attempt to commit aggravated assault; (5) assault; and (6) reckless endangerment. The Appellant also asserts that facilitation of voluntary manslaughter is not a lesser offense of criminal attempt to commit first degree premeditated murder. Accordingly, he contends that the trial court's oral instruction on facilitation of voluntary manslaughter was error.

In the Appellant's written request for jury instructions on lesser offenses, he specifically requested that instructions be given with regard to the following lesser offenses of attempt to commit first degree premeditated murder: facilitation of attempted first degree murder, attempted second degree murder, facilitation of criminal attempt second degree murder, attempted voluntary manslaughter, facilitation of criminal attempt to commit voluntary manslaughter, reckless homicide, criminally negligent homicide, facilitation of criminally negligent homicide, and reckless endangerment. However, during the trial, the Appellant orally requested to withdraw his request for "reckless, the criminally negligent homicide on this count since . . . he did not die. This is the attempted."[7] The trial court instructed the jury as to the lesser offenses of facilitation of attempt to commit first degree murder, attempt to commit second degree murder, facilitation of second degree murder, attempt to commit voluntary manslaughter, and facilitation of attempt to commit voluntary manslaughter.

### a. Facilitation of Voluntary Manslaughter

The Appellant contends that the trial court erred in its oral instruction to the jury with regard to the offense of facilitation of voluntary manslaughter. However, the Appellant concedes that the written instructions given to the jury list the offense as facilitation of attempted voluntary manslaughter. The Appellant fails to make any argument or request for relief in support of this alleged error. *See* Tenn. Ct. Crim. App. R. 10(b). In any event, the erroneous oral jury instruction was clearly harmless.

A jury charge is prejudicially erroneous if it fails to fairly submit the legal issues or misleads the jury. *Vann*, 976 S.W.2d at 101. Contradictory statements in a jury charge are

---

[7]The Appellant also rejected the applicability of an instruction on attempt to commit reckless homicide, stating that "I don't think – can you attempt to act recklessly?"

subject to a harmless error analysis. *State v. Dulsworth*, 781 S.W.2d 277, 285 (Tenn. Crim. App. 1989). The instruction complained of by the Appellant is as follows:

> The third count of this indictment charges that the [Appellant] . . . with the offense of criminal attempt to wit murder in the first degree. This offense embraces and includes the lesser offenses of facilitation of a felony to wit criminal attempt murder in the first degree, criminal attempt murder in the second degree, facilitation of a felony to wit criminal attempt murder in the second degree, criminal attempt to wit voluntary manslaughter, facilitation . . . to commit a felony to wit voluntary manslaughter.

A comparison with the written instruction clearly shows that the failure to include the word attempt was an oversight in the oral instruction. We cannot conclude that the oversight of the word attempt in the oral charge constitutes anything but harmless error. *Cf. Gacy v. Welborn*, 994 F.2d 305, 307-08 (7th Cir.) (affirming denial of habeas petition where correct written instructions were available to resolve any potential confusion created by misstatement in oral instructions), *cert. denied*, 510 U.S. 899, 114 S. Ct. 269 (1993); *Wood v. Marshall*, 790 F.2d 548, 551 (6th Cir. 1986) (no constitutional error where trial judge gave contradictory oral instructions, but written instructions correctly stated burdens on insanity defense), *cert. denied*, 479 U.S. 1036, 107 S. Ct. 889 (1987). The Appellant is not entitled to relief on this issue.

### b. Assault Offenses

In the instant case, the Appellant was charged and convicted of criminal attempt to commit first degree premeditated murder. Aggravated assault is an assault accompanied by serious bodily injury or the use of a deadly weapon. T.C.A. § 39-13-102(a) (2006). Thus, aggravated assault and assault are not lesser included offenses of attempted first degree murder under the *Burns* test because the statutory elements are different. *Burns*, 6 S.W.3d at 466-67; *State v. Trusty*, 919 S.W.2d 305, 311-12 (Tenn. 1996), *overruled on other grounds by State v. Dominy*, 6 S.W.3d 472, 475 (Tenn. 1999); *State v. Joshua Lee Williams*, No. W2000-01435-CCA-R3-CD (Tenn. Crim. App., at Jackson, June 27, 2001), *perm. app. denied*, (Tenn. Oct. 29, 2001); *State v. Christopher Todd Brown*, No. M1999-00691-CCA-R3-CD (Tenn. Crim. App., at Nashville, Mar. 9, 2000), *perm. app. denied*, (Tenn. Sept. 10, 2001). "If a lesser-included offense is not included in the offense charged, then an instruction should not be given, regardless of whether the evidence supports it." *Burns*, 6 S.W.3d at 466-67. Accordingly, it was not error to refuse to instruct the jury on aggravated assault and its lesser offenses including facilitation, attempt, and assault.

### c. Reckless Endangerment

The Appellant asserts that the trial court erred in failing to provide the jury with an instruction on the offense of reckless endangerment. The State concedes that reckless endangerment is a lesser included offense of attempt to commit first degree premeditated murder.

*See Rush*, 50 S.W.3d at 426. The State correctly asserts, however, that any error in failing to instruct the jury as to reckless endangerment is harmless, as the jury convicted the Appellant of the higher offense to the exclusion of all the charged lesser included offenses. *See Williams*, 977 S.W.2d at 105-06.

### 4. Especially Aggravated Robbery

The Appellant next raises as error the trial court's failure to instruct the jury as to the lesser offenses of: (1) attempt to commit especially aggravated robbery; (2) attempt to commit aggravated robbery; (3) attempt to commit robbery; (4) solicitation to commit especially aggravated robbery, aggravated robbery, and robbery; (5) theft of property; and (6) aggravated assault. The Appellant asserts that the trial court must provide an instruction on lesser offenses supported by the evidence even if such instruction is inconsistent with the theory of the State or the defense. The State responds that the Appellant has waived consideration of instructions on solicitation of especially aggravated robbery, solicitation of aggravated robbery, and solicitation of robbery, because the Appellant failed to request a written instruction on these offenses and because he failed to preserve the issue in his motion for new trial. *See Page*, 184 S.W.3d at 223; Tenn. R. App. P. 3(e). The record reflects, however, that the Appellant made an oral request for the charge of solicitation.

In the Appellant's written request for jury instructions on lesser offenses, he specifically requested that instructions be given on the following lesser offenses of especially aggravated robbery: facilitation of especially aggravated robbery, attempt to commit especially aggravated robbery, facilitation of attempt to commit especially aggravated robbery, aggravated robbery, facilitation of aggravated robbery, attempt to commit aggravated robbery, facilitation of attempt to commit aggravated robbery, robbery, attempt to commit robbery, facilitation of robbery, facilitation of attempt to commit robbery, aggravated assault, facilitation of aggravated assault, attempt to commit aggravated assault, facilitation of attempt to commit aggravated assault, assault, attempt to commit assault, facilitation of assault, facilitation of attempt to commit assault, theft of property, attempt to commit theft of property, facilitation of theft of property, and facilitation of attempt to commit theft of property. The trial court made the following remarks regarding lesser offenses of especially aggravated robbery: "I'm charging especially aggravated robbery, aggravated robbery, and facilitation of each of those." The court rejected the request to instruct on theft of property or assault. Regarding the request to instruct on attempts of the lesser offenses, the trial court stated:

> . . . I don't see any basis, factual basis on which to charge attempted especially aggravated robbery or attempted aggravated robbery. Facilitation I do see a factual basis . . . .
>
> So facilitation would be appropriate, but the clear and undisputed proof from start to finish in this case including the statements given by [y]our client that are in evidence all establish the fact that if there was robbery at all, then it was a

completed robbery. At a minimum, that red Jeep was stolen and some items out of the red Jeep . . . . So I don't see any factual basis at all for charging attempted robberies. . . .

### a. Waived Offenses

The Appellant failed to file a written request for the offenses of solicitation of especially aggravated robbery, solicitation of aggravated robbery, and solicitation of robbery. Accordingly, consideration of these offenses is waived on appeal.[8] The review of the trial court's failure to instruct the jury on lesser included offenses, even when not requested in writing, proceeds under a plain error analysis. *Page*, 184 S.W.3d at 230-31.

In the instant case, the Appellant was convicted of the completed offense of especially aggravated robbery. Solicitation is defined as follows:

> Whoever, by means of oral, written or electronic communication, directly or through another, intentionally commands, requests or hires another to commit a criminal offense, or attempts to command, request or hire another to commit a criminal offense, with the intent that the criminal offense be committed, is guilty of the offense of solicitation.

T.C.A. § 39-12-102(a) (2006). However, part (c) of the *Burns* test is limited to "'situations in which a defendant attempts to commit, or solicits another to commit, either the crime charged or a lesser-included offense, but no proof exists of the completion of the crime.'" *State v. Robinson*, 146 S.W.3d 469, 487 (Tenn. 2004) (quoting *Ely*, 48 S.W.3d at 717). As in these cases, the evidence in the instant case established either the completed offense or a claim of innocence. Thus, it was not error for the trial court to decline to instruct the jury on solicitation.

### b. Attempt Offenses

The Appellant asserts that the trial court erred by failing to instruct the jury as to the lesser offenses of attempt to commit especially aggravated robbery, attempt to commit aggravated robbery, and attempt to commit robbery.[9] The State asserts that the trial court properly denied instruction as to the inchoate attempt offenses. Specifically, the State contends that the proof established that the crime was complete. The Appellant admitted in his statements to the police that he took cash, property, and a vehicle from the victim. Accordingly, the State

---

[8]We additionally note that the Appellant fails to make a specific argument regarding the failure to instruct on the solicitation offenses as lesser offenses of especially aggravated robbery, nor does he make a specific argument as to why the omission of said instruction is not harmless.

[9]The Appellant fails to make a specific argument regarding the failure to instruct on the attempt offenses as lesser offenses of especially aggravated robbery, nor does he make a specific argument as to why the omission of said instruction is not harmless.

asserts that no reasonable juror could have found that the Appellant attempted to commit any form of robbery.

Since inchoate offenses such as attempt are considered lesser included offenses of the crime charged, the attempt crimes relating to the robbery offense are lesser included offenses of especially aggravated robbery. *See Burns*, 6 S.W.3d at 466-67; *State v. Samuel L. Giddfens, Jr.*, No. M2005-00691-CCA-R3-CD (Tenn. Crim. App., at Jackson, Mar. 13, 2006), *perm. app. denied*, (Tenn. Jun. 26, 2006). Thus, the trial court should have instructed the jury as to these offenses. Notwithstanding, since they jury found the Appellant guilty of the higher offense to the exclusion of the intervening lessers, including rejecting lesser completed offenses, the trial court's failure to instruct the jury on the attempt offenses was harmless beyond a reasonable doubt. *See Williams*, 977 S.W.2d at 105-06.

### c. Theft of Property

The Appellant argues that theft of property is a lesser offense of especially aggravated robbery.[10] The State concedes that the trial court should have instructed the jury as to the offense of theft of property.

Theft of property is a lesser included offense of especially aggravated robbery under part (a) of the *Burns* test. *Bowles*, 52 S.W.3d at 79-80 (holding that theft is a lesser included offense of robbery); *State v. Lewis*, 36 S.W.3d 88, 99-100 (Tenn. Crim. App. 2000) (stating theft of property is a *Burns* part (a) lesser included offense of attempted robbery); *State v. Curtis Buford*, No. W2003-00370-CCA-R3-CD (Tenn. Crim. App., at Jackson, Mar. 2, 2004), *perm. app. denied*, (Tenn. Sept. 13, 2004) (theft of property is included in the definition of aggravated robbery and is a lesser included offense). The error in failing to instruct on the offense of theft of property is harmless, however. Our supreme court has held that when a jury convicts on the greater offense to the exclusion of the immediately lesser included offense, the error in failing to instruct will normally be harmless beyond a reasonable doubt. *See Williams*, 977 S.W.2d at 105-06. The trial court instructed the jury on the charged offense of especially aggravated robbery and the immediately lesser included offenses of aggravated robbery and robbery. The jury chose to convict the Appellant of the greater offense. Therefore, consideration of the trial court's error is not necessary to do substantial justice, and the Appellant is not entitled to relief on this issue.

### d. Aggravated Assault

The Appellant asserts that aggravated assault is a lesser offense of especially aggravated robbery,[11] and the State concedes that the trial court should have granted the written request and

---

[10]The Appellant fails to make a specific argument regarding the failure to instruct on the offense of theft of property, nor does he make a specific argument as to why the omission of said instruction is not harmless.

[11]The Appellant fails to make a specific argument regarding the failure to instruct on the offense of aggravated assault as a lesser offense of especially aggravated robbery, nor does he make a specific argument as to why the omission of said instruction is not harmless.

instructed the jury on aggravated assault. Aggravated assault is a lesser included offense of aggravated robbery. *State v. Franklin*, 130 S.W.3d 789, 798 (Tenn. Crim. App. 2003); *State v. Jason C. Carter*, No. M1998-00798-CCA-R3-CD (Tenn. Crim. App., at Nashville, Apr. 27, 2000). Because the evidence was sufficient to warrant an instruction on the greater offense of especially aggravated robbery, the evidence was necessarily sufficient to warrant an instruction on the lesser offense of aggravated assault. *See Richmond*, 90 S.W.3d at 660. Accordingly, the trial court erred in failing to instruct the jury on the lesser offense of aggravated assault.

Having concluded that the trial court's failure to instruct the jury on aggravated assault was error, we must now determine whether the error was harmless beyond a reasonable doubt. In determining whether it was harmless beyond a reasonable doubt not to charge a lesser offense, our supreme court has held that:

> the reviewing court must determine whether a reasonable jury would have convicted the defendant of the lesser offense instead of the charged offense. In other words, the reviewing court must determine whether it appears beyond a reasonable doubt that the trial court's failure to instruct on the lesser offense did not affect the outcome of the trial.

*Id*. at 662 (citing *Allen*, 69 S.W.3d at 191). There is no dispute in the proof that the Appellant removed property belonging to the victim. The jury was instructed on the lesser offenses of aggravated robbery and robbery but opted to convict the Appellant of the indicted offense of especially aggravated robbery. Accordingly, we conclude that the trial court's failure to charge aggravated assault as a lesser offense was harmless beyond a reasonable doubt. *See Williams*, 977 S.W.2d at 105-06.

## II. Penalty Phase Issues

### a. Failure to Charge Aggravating Circumstances in Indictment

The Appellant asserts that the "imposition of the death penalty . . . violated due process of law because the aggravating circumstances were not set forth in the indictment." In this regard, he contends that "[a]ny fact that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt in order to satisfy the 5th Amendment's Due Process Clause and the 6th Amendment's notice and jury trial guarantees." With reliance upon *Apprendi v. New Jersey* and *Ring v. Arizona*, the Appellant submits that he was denied due process of law because the indictment returned by the grand jury did not include facts that would qualify him for the death penalty. In other words, he maintains that first degree murder is not a capital offense unless accompanied by aggravating factors. In order to elevate the crime to capital murder, he alleges that the indictment must include language of the statutory aggravating circumstance(s).

The Tennessee Supreme Court has consistently rejected this argument by holding that aggravating circumstances need not be pled in the indictment. *State v. Reid*, 164 S.W.3d 286, 312 (2005); *Leach*, 148 S.W.3d at 59; *Berry*, 141 S.W.3d at 562; *State v. Holton*, 126 S.W.3d 845, 863 (Tenn. 2004); *State v. Dellinger*, 79 S.W.3d 458, 467 (Tenn. 2002). Our supreme court explained, "[t]he focus in *Apprendi, Ring,* and *Blakely* was on the Sixth Amendment right to trial by jury," and "the Court expressly declined to impose the Fifth Amendment right to presentment or grand jury indictment upon the States." *Berry*, 141 S.W.3d at 560. The Appellant is not entitled to relief on this issue.

## b. Victim Impact Jury Instruction was Coercive

The Appellant next contends that "[t]he jury instructions given by the trial judge with respect to the jury's consideration of victim impact evidence constituted a coercive instruction." In instructing the jury, the trial court provided the following instruction as to victim impact evidence:

> The prosecution has introduced what is known as victim impact evidence. This evidence has been introduced to show the financial, emotional, psychological or physical effects of the victim's death on the members of the victim's immediate family and close friends. You may consider this evidence in determining an appropriate punishment.

> However, your consideration must be limited to a rational inquiry into the culpability of the [Appellant], not an emotional response to the evidence. Victim impact evidence is not the same as an aggravating circumstance. Proof of an adverse impact on the victim's family or close friends is not proof of an aggravating circumstance. Introduction of victim impact evidence in no way relieves the State of its burden to prove beyond a reasonable doubt to you at least one aggravating circumstance which has been alleged.

> You may consider this victim impact evidence in determining the appropriateness of the death penalty only if you first find the existence of one or more aggravating circumstances has been proven beyond a reasonable doubt by evidence independent from the victim impact evidence and find that the aggravating circumstance or circumstances found outweigh the finding of one or more mitigating circumstances beyond a reasonable doubt.

The Appellant, relying upon *Johnson v. Hardin*, 926 S.W.2d 236, 242 (Tenn. 1996), asserts that the trial court's instruction "amounts to an undue intrusion into the exclusive province of the jury." He adds that "there is a reasonable probability that the instruction coerced a finding by the jury that the aggravating circumstances outweighed the mitigating circumstances because to find otherwise would require the jury to ignore the emotional victim impact evidence presented by the State." The Appellant's reliance upon *Johnson* is misplaced because in *Johnson*

-45-

our supreme court addressed the issue of the trial court's deliverance of a "dynamite charge" to a deadlocked jury. The instruction in *Johnson* "raised [to the deadlocked jury] the specter of the time, effort, and money that a new trial would entail." *Johnson*, 926 S.W.2d at 243. The charge suggested that the jurors had a duty to agree. In this regard, our supreme court held "[n]othing should be done or said to a juror which can in any manner be taken by that juror to indicate that he or she should abandon an honestly held conviction in order to reach a verdict so that time and money will be saved." *Id*. (quoting *Bass v. Barksdale*, 671 S.W.2d 476, 486 (Tenn. Crim. App. 1984). Such a situation is not presently before the court, as the factual circumstances in *Johnson* are clearly distinguishable from those in the present case.

In fact, the instruction provided to the jury in the present case was recommended by our supreme court in *State v. Nesbit*, 978 S.W.2d 872, 892 (Tenn. 1998), and was again approved in *State v. Reid*, 91 S.W.3d 247, 283 (Tenn. 2002). *See also State v. Riels*, ___ S.W.3d ___ (Tenn. 2007); *Reid*, 164 S.W.3d at 336-37 (Appendix); *Cole*, 155 S.W.3d at 914 (approving *Nesbit* victim impact instruction). Moreover, in *Reid*, our supreme court specifically noted that any contradiction arising between the instruction and the statute inured to the benefit of the defendant and, thus, should not entitle a defendant to relief. *Reid*, 91 S.W.3d at 283. Accordingly, the Appellant is not entitled to relief on this issue.

### c. Improper Closing Argument

In his next issue, the Appellant challenges the closing argument made by the prosecution. Specifically, he argues that: (1) the prosecutor misstated the law regarding mitigating factors; (2) the prosecutor improperly argued that a sentence short of death would negate the conviction; and (3) the prosecutor argued facts not in evidence.

In successful claims of prosecutorial misconduct, a defendant must show that the argument was so inflammatory or the conduct so improper that it affected the verdict to his detriment. *Harrington v. State*, 385 S.W.2d 758, 759 (Tenn. 1965). Tennessee courts "have traditionally provided counsel with a wide latitude of discretion in the content of their final argument" and trial judges with "wide discretion in control of the argument." *State v. Zirkle*, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995). A party's closing argument "must be temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *State v. Middlebrooks*, 995 S.W.2d 550, 557 (Tenn. 1999). The five generally recognized areas of prosecutorial misconduct in closing argument occur when the prosecutor intentionally misstates the evidence or misleads the jury on the inferences it may draw from the evidence; expresses his or her personal opinion on the evidence or the defendant's guilt; uses arguments calculated to inflame the passions or prejudices of the jury; diverts the jury from its duty to decide the case on the evidence by injecting issues broader than the guilt or innocence of the accused under the controlling law or by making predictions on the consequences of the jury's verdict; or intentionally refers to or argues facts outside the record,

other than those which are matters of common public knowledge. *State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003), *perm. app. denied*, (Tenn. 2003).

For a defendant to be entitled to a new trial on the basis of allegedly improper remarks during closing arguments, the remarks must be shown to have prejudiced the case by affecting the jury's verdict. *Middlebrooks*, 995 S.W.2d at 559. In determining whether this occurred, we consider the following factors: (1) the conduct viewed in light of the circumstances and facts in the case; (2) any curative measures taken by the trial court and the prosecution; (3) the prosecutor's intent in making the improper statements; (4) the cumulative effect of the prosecutor's statements and other errors in the record; and (5) the relative strength and weakness of the case. *Id*. at 560.

### 1. Misstatements as to the Law Regarding Mitigating Factors

The Appellant asserts that the prosecutor improperly informed the jury that they did not have to consider mitigating circumstances. He also complains that the prosecutor attempted to negate the mitigating factor that the Appellant had no significant criminal history by informing the jury that the Appellant had a juvenile adjudication for theft. Finally, he argues that the prosecutor improperly used a "slippery slope" argument related to the consideration of mitigating circumstances. The challenged portion of the argument is as follows:

> But the law requires that the Court instruct you and give you every possible, possible relevant factor, just like it did with the lesser included offenses. So you're going to get a whole list of 17 or 18 of them, a whole slew of them. But the Court is not telling you that any of those are mitigating circumstances. The Court can't do that because that's your job. That's your function. And you get to decide whether any of these 17 or 18 decisions are mitigating circumstances. And after that, you get to decide whether to assess any of them any credibility.

The defense objected, but the trial court declined to give a curative instruction. Notwithstanding, the trial court instructed the prosecutor to phrase her argument to convey that the circumstances presented are mitigating circumstances and that the jury could only accept or reject them. The prosecutor's subsequent comments complied with the trial court's directive. The Appellant's closing argument further honed the jury's role regarding mitigating circumstances. We cannot conclude that the original statement of counsel was so prejudicial as to invalidate the verdict. The Appellant is not entitled to relief on this issue.

The Appellant also challenges the prosecutor's attempt to correct her misstatement that the Appellant had a prior juvenile adjudication for theft of property. While the Appellant objected to the original misstatement, he did not request a curative instruction. Notwithstanding, the trial court instructed the prosecutor to explain to the jury that the theft or property conviction "is deleted." In complying with the court's direction, the prosecutor explained:

-47-

> I apologize. I misspoke. The theft of property that you heard about was one that wasn't sustained or handled non-judicially, which means it didn't stay on the defendant's criminal background.

The Appellant made no further objections to this argument. For this reason, the State asserts that the Appellant has waived any further challenge to the comment. *See* Tenn. R. App. P. 36(a). We agree.

The Appellant next asserts that the prosecutor improperly used a "slippery slope" argument. Specifically, he challenges the following statement:

> And I want you to think, too, when you look at those mitigating circumstances and when you think about whether or not to give them any weight, I want you to each ask yourself if I give this one weight, what else do I have to give weight? If I give weight to the fact that he's HIV, what else do I give weight to those that have cancer and other diseases and tumors and high blood pressure? That's what I want you to ask yourself.

The State asserts that the Appellant has waived consideration of this issue on appeal by failing to object to the argument at trial and by failing to raise the issue in his motion for new trial. The record does reflect that no objection was made to the argument, nor was the issue raised in the motion for new trial. "It is well settled that without a contemporaneous objection to a prosecutor's statements, the error is waived." *State v. Stephenson*, 195 S.W.3d 574, 601 (Tenn. 2006) (citations omitted). Accordingly, consideration of the issue by this court is waived. *See* Tenn. R. App. P. 3(e); 36(a).

Finally, the Appellant challenges the prosecutor's comments that application of the mitigating factors would give the Appellant special treatment. During closing arguments, the prosecutor commented on all the mitigating circumstances alleged. At the conclusion of this portion of her closing argument, she stated:

> It's sad but with your everyday common lifetime experiences, you know that it is common for some kids to pick on others, especially in sibling situations. Does it set him apart from any other defendant who commits murder? Does it make him special? Does it make him different? Because a mitigating circumstance, ladies and gentlemen, is one that sets it apart, something that makes this offense something that deserves this [Appellant] – this [Appellant] deserved to be treated differently than everybody else, special consideration.

The Appellant objected, stating that the prosecutor's comments were geared to saying that the mitigating circumstances were not mitigating factors. The trial court overruled the objection, remarking:

Well, I guess it's all part of application of the law. And it's not so much that he's going to be given any special treatment. He's going to be treated like anybody else under the law and the jury is entitled to consider these things. I understand your objection. I'll simply state that you should – since you have your argument yet to come, that you should respond to it in your argument. That would be a better course.

During the Appellant's closing argument, counsel carefully explained to the jury the role and effect of mitigating circumstances.

Closing arguments must be temperate, must be based upon evidence introduced during trial, and must be relevant to the issues at trial. *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn. 1978). The State should refrain from argument designed to inflame or incite the emotions of the jury. *Coker*, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995). Reading the prosecutor's statements within the context of her argument as to the mitigating factors, we concur with the trial court's finding that the argument was proper. The effect of the prosecutor's statements went to the weight that should be given to each mitigating factor.

### 2. Improper Argument that Sentence Short of Death Would Negate Conviction

During closing argument, the prosecutor commented:

Now we're moving into . . . the latter stage or the penalty phase. And it is considerabl[y] shorter than the first phase or the rest of the trial. But make no mistake, it is no less important. And in fact, it's more important because the wrong punishment negates the proper verdict. And the wrong punishment negates a guilty verdict.

Defense counsel objected. The trial court sustained the objection and stated that the comment "perhaps went beyond what is appropriate." The trial court then offered the following curative instruction:

Okay. Ladies and gentlemen, let me instruct you that the last comment made by [the State] is not to be considered, that whatever your decision is ultimately will be the right decision. And it will not in any way negate the verdict you've reached or the decision you've made thus far. All right. You may proceed.

The Appellant asserts that the trial court erred by giving a curative instruction rather than granting a mistrial. In support of this argument, he contends that an appeal to the jurors that a sentence less than death would cancel the conviction could not be ignored during deliberations. The State contends, however, that the issue is waived because the Appellant did not request a

mistrial and that, in any event, the trial court's curative instruction was sufficient to safeguard the Appellant from the comment's prejudicial effect, if any.

While the Appellant objected after the comments were made, he did not ask the trial court to declare a mistrial, nor did he raise the issue in his motion for new trial. Under Tenn. R. App. P. 36(a), this court is not required to grant relief to a party when he or she "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a).

The decision of whether to grant a mistrial is within the sound discretion of the trial court. *State v. Smith*, 871 S.W.2d 667, 672 (Tenn. 1994); *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). "Generally, a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). In reviewing a trial court's denial of a motion for mistrial, this court will not disturb that decision unless there is an abuse of discretion. *State v. Brown*, 53 S.W.3d 264, 284 (Tenn. Crim. App. 2000). Moreover, the burden of establishing the necessity for mistrial lies with the party seeking it. *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). No abstract formula should be mechanically applied in making this determination, and all circumstances should be taken into consideration. *State v. Mounce*, 859 S.W.2d 319, 322 (Tenn. 1993).

In the present case, we do not find that a manifest necessity existed which required a mistrial. As noted, in this case, the trial court provided a curative instruction, and jurors are presumed to follow the instructions given them absent evidence to the contrary. *State v. Jordan*, 116 S.W.3d 8, 18 (Tenn. Crim. App. 2003). Moreover, we cannot conclude, after consideration of the curative instruction issued by the trial court, that the prosecutor's remarks were so prejudicial to the Appellant as to invalidate his conviction. *See Judge v. State*, 539 S.W.2d 340, 343 (Tenn. Crim. App. 1976). The Appellant is not entitled to relief on this issue.

### 3. Prosecutor Argued Facts not in Evidence

The Appellant also asserts that the prosecutor argued that the victim, Al-Maily, witnessed the robbery and that he begged for his life, facts not established by the evidence. During closing argument, the prosecutor stated:

Uncle stood by the door and let me in. The [Appellant] in his second statement after he has shot Mr. Atilebawi three times and left him outside in a pool of his own blood enters that house. And when he re-enters that house to get all of the things that he wants to take away from another person. Uncle let him in. Uncle was at the front door. And Uncle saw what he did. Uncle saw the gun. And Uncle begged for his life. And you know that because he handed him approximately $300. Take my money. Just don't kill me. 300 bucks.

The State asserts that the Appellant has waived consideration of this issue by failing to object to the argument at trial and by failing to raise the issue in his motion for new trial. The record does reflect that no objection was made to the argument, and the issue was not raised in the motion for new trial. "It is well settled that without a contemporaneous objection to a prosecutor's statements, the error is waived." *Stephenson*, 195 S.W.3d at 601 (citations omitted). Accordingly, consideration of the issue by this court is waived. *See* Tenn. R. App. P. 3(e), 36(a). Notwithstanding waiver, we note that the jury was instructed that the arguments of counsel were not evidence, and the jury is presumed to follow the instructions provided by the trial court. *Reid*, 164 S.W.3d at 346 (citing *State v. Smith*, 893 S.W.2d 908, 914 (Tenn. 1994)). This issue is without merit.

### d. Excessive Sentences for Non-Capital Convictions

The Appellant contests the propriety of the sentences for his convictions of criminal attempt to commit first degree murder and especially aggravated robbery, both Class A felonies. For each conviction, the Appellant received a sentence of twenty-five years incarceration in the Tennessee Department of Correction. The trial court further ordered that the sentences were to be served consecutively to one another, as well as consecutively to the sentence of death. In contesting the propriety of his sentences, the Appellant contends that the sentences are in violation of *Blakely v. Washington*, are excessive, and that consecutive sentences are not proper.

Effective June 7, 2005, the Tennessee General Assembly, in response to the United States Supreme Court case of *Blakely v. Washington,* 542 U.S. 296, 124 S. Ct. 2531 (2004), amended Tennessee Code Annotated sections 40-35-102, -210, and -401 to reflect the advisory nature of enhancement factors. *See* 2005 Tenn. Pub. Acts ch. 353, §§ 1, 6, 8. The amendment, among other things, removed the presumptive sentence language from our Sentencing Act and mandated only that the trial "court shall impose a sentence within the range of punishment. . . ." *See* T.C.A. § 40-35-210(c) (Supp. 2005); *cf.* T.C.A. § 40-35-210(c) (2003). The "Compiler's Notes" to this amendment states:

> Acts 2005, ch. 353, § 18 provided that the act shall apply to sentencing for criminal offenses committed on or after June 7, 2005. Offenses committed prior to June 7, 2005, shall be governed by prior law, which shall apply in all respects. However, for defendants who are sentenced after June 7, 2005, for offenses committed on or after July 1, 1982, the defendant may elect to be sentenced under the provisions of the act by executing a waiver of such defendant's ex post facto protections. Upon executing such a waiver, all provisions of the act shall apply to the defendant.

T.C.A. § 40-35-210 (Supp. 2005), Compilers's Notes. The transcript of the sentencing hearing indicates that the Appellant executed such a waiver and expressly stated his desire to proceed

under the new act.[12] Accordingly, the new act governs the Appellant's sentencing with regard to the Class A felony convictions.

"When reviewing sentencing issues . . ., the appellate court shall conduct a *de novo* review on the record of such issues. Such review shall be conducted with a presumption that the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d) (2006). "However, the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). In conducting our review, we must consider a defendant's potential for rehabilitation, the trial and sentencing hearing evidence, the pre-sentence report, the sentencing principles, sentencing alternative arguments, the nature and character of the offense, the enhancing and mitigating factors, and a defendant's statements. T.C.A. §§ 40-35-103(5), -210(b) (2006); *Ashby*, 823 S.W.2d at 169. We are to also recognize that the defendant bears "the burden of demonstrating that the sentence is improper." *Ashby*, 823 S.W.2d at 169.

The 2005 amended act requires the judge to consider, but not be bound by, these advisory guidelines to arrive at an appropriate sentence, which is then subject to appellate review. In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, determines the range of sentence and then determines the specific sentence and the propriety of sentencing alternatives by considering: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statements a defendant wishes to make in his or her behalf about sentencing. T.C.A. §§ 40-35-210(a), (b); *State v. Williams*, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995). In balancing these concerns, a trial court should place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing. T.C.A. § 40-35-210(e). No particular weight for each factor is prescribed by the statute. The weight given to each factor is left to the discretion of the trial court as long as it comports with the sentencing principles and purposes of our code and as long as its findings are supported by the record.

At the sentencing hearing, the trial court entered the following findings:

As to the enhancement factors, I do think that the record would reflect that the existence of a previous history of criminal activity and/or convictions – Exhibit 1 to this hearing contains the certified record of several convictions and juvenile adjudications, and the presentence report that's been submitted that's part of the record outlines them as well.

[12]In his brief, the Appellant ignores his waiver but, nonetheless, states a desire to proceed under the new act.

-52-

The second factor that I feel applies is that he was, I think, by the proof, clearly the leader in the commission of this offense. His actions were those that set all of this in motion, and I think any fair reading of the facts would suggest that he was the leader in the commission of this offense.

The third factor, "The injuries inflicted were particularly great." I don't think that that's an element of the offense, necessarily, and certainly the injuries inflicted on the victim, Mr. Atilebawi, were exceedingly great. His condition was pitiful. That's the best word I can think of to describe him when he came into court to testify. Half of his head was essentially blown off, sunken in, and his memory and mental functioning is extremely compromised now as a result of the injuries. His ability to function on a day-to-day basis is extremely compromised. He's living out of his car half the time now, unable to work to earn money. His existence is a pitiful existence at this time, whereas prior to this horrible crime, he was a productive member of our community – a very active business man, and by all accounts, a very generous individual. So I think the injuries that were inflicted were extremely great.

The record would bear out that this [Appellant] failed to comply with conditions of release into the community through the revocation of his – or violation of his probation. And that would dovetail with the other factor that he committed this while on release on probation at the time.

The risk to human life being high, I tend to agree with Ms. Kent. I think that's going to be present pretty much anytime you find somebody guilty of criminal-attempt murder first or especially aggravated robbery, so I won't consider that.

And the position of private trust, the abuse of that position. I do think that the proof bears that out as well. I think the proof was that this [Appellant] had a relatively difficult childhood where he felt fairly abandoned, and the proof was that he went to Leewood Baptist Church and found somewhat of a home there. And he was looking for places to sort of fit in, and one of the places that he fit in was at this home of Mr. Atilebawi and Uncle; and that the relationship that existed was one of almost a mentor or a parent. Mr. Atilebawi gave him whatever he needed whenever he needed it – money, automobiles, a place to hang out – food. It wasn't a situation where this [Appellant] just picked a total stranger to go in and rob and shoot. This was a home where he had this relationship established.

And I think the proof would bear out, because of this relationship, that he was able to get into the house at 2:00 in the morning or whenever it was. He was able to knock on the door or call him on the phone. . . . But there was total trust, and the victims were not concerned at all about letting this [Appellant] in because of the relationship that had existed between them, so I do think that the proof would

bear out that there was an abuse of this position of trust – of private trust in the commission of this offense.

As far as mitigation is concerned, while there was testimony at the sentencing hearing . . . by friends of the [Appellant] and church members who were shocked that he would be involved in something as horrendous and dastardly as these crimes, and they testified as to the difficult childhood he had and how frequently he attended church and how he would go on his own to the church, and they would swing by and pick him up sometimes and all of that; and that is all very sad and compelling. What struck me most, then and now about this [Appellant], is that – and about his testimony today from the stand, under oath, is the total and absolute lack of remorse shown on his part – absolutely no remorse at all – killed one man in cold blood and completely destroyed the life of a second man who is alive only because he's breathing, but his life is a very minimal existence at this point – no remorse, whatsoever, for what he did. Not one tear shed, not one apology, not one ounce of regret or remorse. Even today from the stand, all he can say is that he just wants – wants leniency – he wants to shift the focus away from all – to quote him – all the hatred that was shown during the trial. I guess there was a little bit of bitterness at the trial by a man who had half his head blown off by the [Appellant]; but it doesn't seem to me that this [Appellant] has begun to understand the enormity of the crime that he committed.

So I think that that has to be weighed against the, quote, mitigation that has been presented.

And while these witnesses who came in on his behalf were crying for him, the [Appellant], I've yet to see anybody come in and cry for these victims who are now in the grave or have one foot in the grave because of this [Appellant's] actions. So I don't find mitigation to be very compelling in this case because of that.

        . . . .

. . . I think that balancing the mitigation, which I don't find to be – which I don't find to exist in light of the absence of remorse against several aggravating factors which I've enumerated, I think that the – and the absolute horrendous nature of this offense – I think that the maximum sentence is appropriate whether one starts at the minimum or the mid-point. It really doesn't matter, in my judgment. The maximum sentence is appropriate in this case. . . . I cannot, in good conscience, sentence this man to anything less than the maximum sentence given the heinous and shocking nature of these offenses. . . .

And as far as consecutive sentencing is concerned, there is a record of criminal activity, and it is fairly extensive given the young age of this [Appellant]. He is, at this point, only twenty-one years old, and he still, in spite of his young age, has the numerous arrests and convictions that are reflected in the record – both juvenile record and the presentence report.

And he is a dangerous offender, I believe given the facts of this case. And I think his lack of remorse would even factor into his being considered a dangerous offender. And part of that would be his actions after committing these two just unthinkable offenses; does he run to his preacher at Leewood Baptist Church and ask for a counseling session with him? No. He takes the truck and money and goes out and buys new tires for the truck or new rims or whatever it was and goes out and starts spending money – goes visits friends. I think that adds to the dangerous nature of this man – someone who is so cold as to do that while these two people are back in their driveway and in their home dying.

Is he flooded with remorse so that he calls 911 and has an ambulance come out to render aid to these two men? Perhaps – who knows, perhaps even saving the life of the one that died? No. He's out buying rims for this truck that he just [stole].

. . . .

. . . And so I think in order to reasonably relate to the severity of these offenses and for the protection of this community, consecutive sentencing is absolutely necessary, and I'm going to sentence this man to fifty years – twenty-five years and twenty-five years consecutive to one another and consecutive to the other sentence that he received. . . .

### 1. Length of Sentence

The trial court applied six enhancement factors: (1) the defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; (2) the defendant was a leader in the commission of an offense involving two or more criminal actors; (3) the personal injuries inflicted upon or the amount of damage to property sustained by or taken from the victim was particularly great; (4) the defendant failed to comply with conditions of release into the community through the revocation of his – or violation of his probation; (5) the felony was committed while the defendant was on probation; and (6) the defendant abused a position of private trust. *See* T.C.A. § 40-35-114(1), (2), (6), (8), (13), (14) (2006). On appeal, the Appellant contends that several of these factors were improperly applied by the trial court. Specifically, he challenges the application of factor (6), that the personal injuries inflicted upon or the amount of damage to property sustained by or taken from the victim was particularly great; factor (2), that the defendant was a leader in the commission of an offense involving two or more criminal actors; and factor (14), that the defendant abused a position of

private trust. Additionally, the Appellant asserts that the trial court improperly rejected all mitigating factors based solely on the Appellant's lack of remorse.

The State argues that, under the new sentencing provisions, the Appellant is unable to argue that his sentence is excessive based on the application of enhancement or mitigating factors. *See* T.C.A. § 40-35-401. The State asserts that the 2005 amendments to the Sentencing Act limit an Appellant's scope of appeal regarding a claim that the sentence imposed is "excessive." The Appellant has failed to respond to this argument made by the State.

Section 40-35-401(b), Tennessee Code Annotated, establishes the parameters of an appellate challenge to a sentence:

> (1) The sentence was not imposed in accordance with this chapter;
>
> (2) The sentence is excessive under the sentencing considerations set out in §§ 40-35-102 and 40-35-210; or
>
> (3) The sentence is inconsistent with the purpose of sentencing set out in §§ 40-35-102 and 40-35-103. [3]1

The 2005 amendment deleted appellate review of the weighing of the enhancement and mitigating factors, as it rendered the enhancement and mitigating factors merely advisory, not binding, on the trial courts. Accordingly, we conclude that error in the application of enhancement factors will not necessarily result in modification of the sentence if the trial court, in determining the specific sentence, considered the nature and characteristics of the crime, the character and background of the defendant, and that the imposed sentence is not inconsistent with the purposes of the Sentencing Act. *See* T.C.A. § 40-35-210(b), (d) (2005).

The State concedes that the trial court improperly considered enhancement factor (6), that the personal injuries inflicted upon or the amount of damage to property sustained by or taken from the victim was particularly great, because this factor is an essential element of especially aggravated robbery. Similarly, the State concedes that the trial court improperly considered enhancement factor (14), that the defendant abused a position of private trust, because the evidence fails to support application of the factor. Notwithstanding, the State asserts, and we agree, that the evidence unquestionably supports consideration of factor (2), that the defendant was a leader in the commission of an offense involving two or more criminal actors. The record also supports consideration of factors (1), that the defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;

---

[13]Prior to the amendment in 2005, the statute permitted appeal on the grounds that included "(1) [t]he sentence was not imposed in accordance with . . . chapter [thirty-five of the Act]; or (2)[t]he enhancement and mitigating factors were not weighed properly, and the sentence is excessive under the sentencing considerations set out in [section] 40-35-103 [of the Act]." T.C.A. § 40-35-401(b) (Supp. 2005).

(4), that the defendant failed to comply with conditions of release into the community based on the revocation or violation of his probation; and (5), that the felony was committed while the defendant was on release or probation. Additionally, while lack of remorse is not one of the enumerated advisory enhancement factors, the courts of this state have previously recognized that lack of remorse is relevant when considering a defendant's potential for rehabilitation and sentencing alternatives. *State v. Dowdy*, 894 S.W.2d 301, 306 (Tenn. Crim. App. 1994), *perm. app. denied*, (Tenn. Jun. 4, 2001) (citations omitted). When determining the length of the sentence, it is appropriate for the court to consider the potential for rehabilitation. *See* T.C.A. § 40-35-103(5).

The record reveals that the trial court considered the mitigating factors raised by the proof at the penalty phase, but the court concluded that the mitigating evidence was not compelling. Thus, the record reveals that the trial court considered the nature and characteristics of the criminal conduct involved, the history and background of the Appellant, the mitigating and enhancement factors advanced by the parties, and the Appellant's request for leniency. *See* T.C.A. § 40-35-210(b). The Appellant was convicted as a Range I offender of Class A felonies; thus, the applicable sentencing range is fifteen to twenty-five years. T.C.A. § 40-35-112(a)(1) (2006). A twenty-five year sentence on each offense is reasonable and justified considering the relevant principles of sentencing, as well as the circumstances of both the Appellant and the offenses. The Appellant is not entitled to relief on this issue.

### 2. Consecutive Sentences

The Appellant further argues that "consecutive sentencing is inappropriate in this case." Specifically, he contends that his criminal history is not extensive and that he does not qualify as a dangerous offender. Additionally, he asserts that, because he is under a sentence of death, consecutive sentences are not necessary to protect the public against further criminal conduct by the Appellant. The State contends that consecutive sentencing is appropriate in this case. We agree with the State.

A trial court may impose consecutive sentencing upon a determination, by a preponderance of the evidence, that one or more of the criteria set forth in Tennessee Code Annotated section 40-35-115(b) exists. Pursuant to this code section, a trial court may impose consecutive sentencing if it determines:

. . . .

(2) The defendant is an offender whose record of criminal activity is extensive;

. . . .

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high; [or]

. . . .

(6) The defendant is sentenced for an offense committed while on probation[.]

T.C.A. § 40-35-115(b)(2), (4), (6) (2006). The criteria are stated in the alternative; therefore, only one need exist to support the imposition of consecutive sentencing. However, if the trial court imposes consecutive sentencing based solely upon a finding that a defendant is a dangerous offender, the court must also determine whether the sentences imposed are reasonably related to the severity of the offenses and necessary to protect the public from further criminal activity by that defendant. *State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn. 1995). Additionally, the trial court should consider general sentencing principles, including whether or not the length of a sentence is justly deserved in relation to the seriousness of the offense. *State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002). Moreover, trial courts must make specific findings regarding these factors before imposing consecutive sentences. *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999). It is within the sound discretion of the trial court whether or not to impose consecutive sentences. *State v. Adams*, 973 S.W.2d 224, 230-31 (Tenn. Crim. App. 1997).

First, as asserted by the State, the Appellant was on probation at the time these offenses were committed. Accordingly, although not relied upon by the trial court, this factor alone would support the trial court's imposition of consecutive sentencing. Additionally, the presentence report reveals that the Appellant had two convictions for assault, one conviction for criminal trespass, one conviction for aggravated burglary, and two traffic offenses. These offenses all occurred within one year, during which time the Appellant also violated the conditions of bail and the terms of his probation. Moreover, the Appellant, as a juvenile, had a series of non-judicially adjudicated offenses including numerous theft of property offenses, an aggravated assault offense, and an aggravated kidnapping offense. Thus, the record supports the trial court's conclusion that the Appellant had an extensive criminal history for a person of his young age.

Finally, the facts of the instant offenses are shocking to say the least. The Appellant planned revenge on what appears to be a friend or mentor. The Appellant shot Atilebawi in the back of the head multiple times. He also shot and killed another victim by making the victim lie face down on the floor, covering this victim with a blanket, and shooting him in the back of the head. The court concluded that the Appellant had no remorse for his reprehensible actions and determined that an extended sentence was necessary to protect the public against further criminal conduct. The trial court also concluded that consecutive sentencing reasonably related to the severity of the offenses. We agree.

After *de novo* review, we conclude that the record clearly supports the findings of the trial court and that the court considered the sentencing principles and all relevant facts and

circumstances required for the imposition of consecutive sentences.  The circumstances of the offenses support a finding that the consecutive sentences imposed reasonably relate to these serious crimes and are necessary to protect the public from further criminal activity by the Appellant.  Accordingly, the Appellant is not entitled to relief on this issue.

### e. Constitutionality of Tennessee Death Penalty Statutes

The Appellant raises numerous challenges to the constitutionality of Tennessee's death penalty provisions.  Upon review, we conclude that the Appellant's specific complaints have been previously rejected by the courts of this state on multiple occasions.  Nonetheless, we acknowledge that the Appellant must raise these issues to preserve them for review by a higher court.  Accordingly, we briefly address each challenge made by the Appellant.

### 1. The Death Penalty Statutes Fail to Narrow the Class of Death Eligible Defendants

The Appellant asserts that Tennessee's death penalty statutes fail to meaningfully narrow the class of death eligible defendants, thereby rendering Tennessee's death penalty statutory scheme unconstitutional.  Specifically, he argues that the statutory aggravating circumstances set forth in Tennessee Code Annotated section 39-13-204((i)(5), (i)(6), and (i)(7) have been so broadly interpreted, whether viewed singly or collectively, that they fail to provide a "meaningful basis" for narrowing the population of those convicted of first degree murder to those eligible for the sentence of death.  Initially, we note that the (i)(5) factor has no application to this case.  Thus, any claim with respect to this factor is without merit.  *See, e.g.*, *State v. Hall*, 958 S.W.2d 679, 715 (Tenn. 1997); *State v. Brimmer*, 876 S.W.2d 75, 86 (Tenn. 1994).  Moreover, the Appellant's argument with regard to all three factors has been rejected by our supreme court on numerous occasions.  *See Vann*, 976 S.W.2d at 117-18 (appendix); *State v. Keen*, 926 S.W.2d 727, 742 (Tenn. 1994).

### 2. The Death Sentence Is Imposed Capriciously and Arbitrarily

The Appellant also argues that the imposition of the death penalty in this state is unconstitutional because the death sentence is imposed capriciously and arbitrarily.  Specifically, he challenges the unlimited discretion vested in the prosecutor as to whether or not to seek the death penalty.  However, this argument has also been rejected.  *State v. Hines*, 919 S.W.2d 573, 582 (Tenn. 1995).  The Appellant further contends that the death penalty is imposed in a discriminatory manner based upon race, geography, and gender.  These arguments have similarly been rejected.  *See id.*; *Cazes*, 875 S.W.2d at 268; *Smith*, 857 S.W.2d at 23.  He also argues that requiring the jury to agree unanimously to impose a life sentence violates *Mills v. Maryland*, 486 U.S. 367, 108 S. Ct. 1860 (1988), and *McKoy v. North Carolina*, 494 U.S. 433, 110 S. Ct. 1227 (1990). This argument has been rejected.  *Brimmer*, 876 S.W.2d at 87; *State v. Thompson*, 768 S.W.2d 239, 250 (Tenn. 1989).  Finally, the Appellant contends that there is a reasonable likelihood that jurors believe they must unanimously agree as to the existence of mitigating

circumstances because of the failure to instruct the jury on the meaning and function of mitigating circumstances.  This argument has likewise been rejected.  *Thompson*, 768 S.W.2d at 250-52.

### 3. The Appellate Review Process in Death Penalty Cases Is Constitutionally Inadequate

The Appellant next asserts that the appellate review process in death penalty cases is constitutionally inadequate.  Specifically, he contends that the review process is not "meaningful" and that the statutorily mandated proportionality review violates due process.  Both arguments have been rejected by our supreme court.  *Vann*, 976 S.W.2d at 118-19; *Cazes*, 875 S.W.2d at 270-71.  Moreover, our supreme court has held that, "[w]hile important as an additional safeguard against arbitrary or capricious sentencing, comparative proportionality review is not constitutionally required." *Bland*, 958 S.W.2d at 663.  Accordingly, the Appellant is not entitled to relief on this claim.

### f.  Review Pursuant to Section 39-13-206(c), Tennessee Code Annotated

Pursuant to Tennessee Code Annotated § 39-13-206(c)(1), we are required to review the application of the death penalty to determine whether:

(A) The sentence of death was imposed in any arbitrary fashion;

(B) The evidence supports the jury's finding of statutory aggravating circumstance or circumstances;

(C) The evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; and

(D) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

T.C.A. § 39-13-206(c)(1) (2006).

### 1.  Arbitrariness

Having thoroughly reviewed the record, we conclude that the sentence of death was not imposed in an arbitrary fashion.

### 2. Sufficiency of Statutory Aggravating Circumstances Found by the Jury

The Appellant challenges the sufficiency of the evidence supporting the aggravating circumstances.  The jury found the presence of two aggravating circumstances: (1) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the Appellant or another; and (2) the murder was committed while the Appellant

had a substantial role in committing a robbery. *See* T.C.A. § 39-13-204(i)(6), (7) (2006). The State responds that the evidence is sufficient to support both aggravating factors.

Our analysis requires that we view the evidence in a light most favorable to the State and determine whether a rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt. *Reid*, 164 S.W.3d at 314. We, in turn, will address the two aggravating circumstances applied in this case. *See* T.C.A. § 39-13-206(c)(1)(B) (requiring review of aggravating circumstances found by the jury).

The proof presented at trial established that the Appellant shot the victim Atilebawi in the back of the head in the driveway of his residence. The Appellant then returned inside the residence where Al-Maily was standing at the door. The Appellant took approximately $300 from Al-Maily and then ordered him to go to the bedroom. The Appellant and his accomplice then removed various valuables, which they placed in the victims' vehicles. The Appellant then returned to the bedroom, ordered Al-Maily to lie face down on the floor, covered him with a blanket, and shot him in the back of the head. The Appellant and his accomplice left in Al-Maily's Chevrolet Caprice and Atilebawi's Jeep Cherokee. The Appellant stated that Al-Maily's presence at Atilebawi's home was a surprise. His stated purpose in going to Atilebawi's house was to seek revenge on Atilebawi for assaulting his pregnant girlfriend and to discuss financial matters.

### a. (i)(6) Factor

In support of his argument relating to the application of the (i)(6) statutory aggravating factor, the Appellant asserts that "[he] did not attempt to flee or avoid prosecution." Rather, he contends "he never left the community where both he and the victim lived." This aggravating circumstance focuses on a defendant's motives in killing the victim. *State v. Young,* 196 S.W.3d 85, 116 (Tenn. 2006) (citations omitted); *State v. Ivy*, 188 S.W.3d 132, 149 (Tenn. 2006). Although there must be some "particular proof" supporting this aggravating circumstance, *State v. Hartman*, 42 S.W.3d 44, 58 (Tenn. 2001), the State need not prove that the defendant's desire to avoid prosecution was his sole motive in murdering the victim. *Young*, 196 S.W.3d at 116. However, we have indicated that there must be some "particular proof" in the record to support this aggravating circumstance, *Hartman*, 42 S.W.3d at 58, and mere plausibility of the theory that avoiding arrest or prosecution was one of the motives of the murder is insufficient. *State v. Powers,* 101 S.W.3d 383, 399 (Tenn. 2003).

With respect to this issue, the Appellant first argues that the only basis for finding the aggravating circumstance in this case is the theory that he killed the victim to prevent his arrest, a theory and circumstance arguably present in every first degree murder in which the victim knows the murderer. The Appellant urges this court to adopt a narrowing construction of the aggravating circumstance and find the evidence in this case insufficient to support its application.

The proof establishes that the victim, Kadhem Al-Maily, observed or overheard the shooting and robbery of his friend, Hussain Atilebawi. After review, it is apparent that the proof,

relevant to this issue, fails to support application of the (i)(6) factor. We are unable to conclude that the Appellant's course of action, before and after the homicide of the victim, is consistent with or corroborative of the motive that he killed the victim to prevent his arrest. Indeed, as asserted by the Appellant, after the perpetration of the crime, he did not flee the area, but, rather, he remained in the community. Moreover, the Appellant made no effort to move his victims or to conceal evidence of the crimes. The Appellant argues that, to apply the (i)(6) factor in this case, without more proof, would make the factor inherent in any murder involving the perpetration of a robbery. We agree. The only other possible theory supporting the existence of the (i)(6) aggravating circumstance is the argument that, because the Appellant knew the victim, it could be inferred that the victim might recognize him. The evidence, however, does not support this inference beyond a reasonable doubt. Indeed, the evidence shows that the Appellant left a witness who could identify him, Atilebawi, and that he knew when he left that Atilebawi was alive. Accordingly, we conclude that the jury's finding of the (i)(6) aggravating factor must be vacated.

### b. Invalidation of the (i)(6) factor

In reaching the determination of whether use of an invalid aggravating circumstance is harmless error beyond a reasonable doubt, our supreme court has concluded that:

> In order to guarantee the precision that individualized sentencing considerations demand and provide a principled explanation for our conclusion in each case, it is important, when conducting harmless error review, to completely examine the record for the presence of factors which potentially influence the sentence ultimately imposed. These include, but are not limited to, the number and strength of remaining valid aggravating circumstances, the prosecutor's argument at sentencing, the evidence admitted to establish the invalid aggravator, and the nature, quality and strength of mitigating evidence.

*State v. Howell*, 868 S.W.2d 238, 260-61 (Tenn. 1993).

After application of the above factors, we would agree that the presence of only one remaining aggravating circumstance weighs against a finding of harmless error. However, the strength of the remaining factor does weigh in favor of harmless error. The nature, quality, and strength of the mitigation evidence is neutral on the issue of harmlessness of the error.

During closing argument, the prosecutor stated:

> . . . And the second one is going to be listed in the Court's instructions as the first. And that aggravating circumstance is that the murder was committed for the purpose of avoiding, interfering or preventing the lawful arrest or prosecution for a crime.

> And in this case what that means in plain laymen's terms is that this murder was committed in order to eliminate a witness, a witness to the robbery. Uncle,

completely innocent, not supposed to be there, a surprise. And he was executed because the [Appellant] told you that time and time again in each of his statements.

Uncle stood by the door and let [him] in. The [Appellant] in his second statement after [he] has shot Mr. Atilebawi three times and left him outside in a pool of his own blood enters that house. And when he re-enters that house to get all of the things that he wants to take away from another person, Uncle let him in. Uncle was at the front door. And Uncle saw what he did. Uncle saw the gun. And Uncle begged for his life. And you know that because he handed him approximately $300. Take my money. Just don't kill me. 300 bucks.

How do you know that the [Appellant] was friends with Uncle? He knew his name. He didn't call him Mr. Al-Maily. He called him Uncle, not once but over and over again in each of his statements. Best friends. 300 bucks, let him in the door, you know he witnessed this crime. And you also know it because he was made to go in the bedroom and lay down on the floor by that [Appellant]. And what did he do, that [Appellant] do, while Uncle was laying on the floor? The stereo, the clothes, where were they? In the same room Uncle was still alive. And while he's lying on the floor, that [Appellant] is coming in and out of that bedroom taking things out. He's witnessing that robbery after he's witnessed the attempted murder and while he's witnessed the [Appellant] with a gun in his hand.

[The Appellant] gathered all the items before Uncle was shot. Uncle was alive. Uncle knew what was going on. It was after everything was loaded that he was shot. Before and after. He tells you what order. He tells you when it happened. And he tells you why. Is there an[y] other conceivable reason he would shoot Uncle? He'd already gotten all the money. He'd already taken everything he wanted. He could have walked back out and left Uncle on that floor alive, but he didn't do that because he was eliminating witnesses, the only witness.

    . . . .

[T]he murder was committed to eliminate a witness. He was a surprise. He wasn't supposed to be there.

And after he'd already committed a shooting, Uncle let's [him] in the door, offers [him] money. [The Appellant] ma[d]e him wait in another bedroom on the floor, but I'm still taking stuff out of that same bedroom on the floor, but [he's] still taking stuff out of that same bedroom so [Al-Maily] knows it's me . . . . And after the crime was committed and [the Appellant] could have left, he executes Uncle in the back of the head. No other reason. No other reason. And that aggravated circumstance . . . is proven in the testimony beyond a reasonable doubt.

. . . .

> [H]e shot that man in the back of the head . . . for what? Because he was a witness. When he shot him and when he eliminated that witness, the only witness, he made his choice.

Despite these statements in support of the (i)(6) aggravating circumstance, the prosecution's argument focused mainly on attacking the mitigating circumstances and the weight that should be applied to them.

After reviewing the entire record and applying the *Howell* analysis, we conclude that the error of charging and allowing the jury to consider the (i)(6) aggravating circumstance was harmless beyond a reasonable doubt.

### c. (i)(7) factor

The Appellant presents a two-fold argument that the (i)(7) factor was misapplied to his first degree murder conviction. First, he contends that the evidence is insufficient to support application of this factor because there is no causal link between the robbery of Atilebawi and the shooting of Al-Maily. Second, he asserts that the (i)(7) factor cannot stand because it is impossible to determine whether the jury applied the factor to the first degree premeditated murder verdict or the first degree felony murder verdict.

In *Middlebrooks*, 840 S.W.2d at 346, our supreme court held that, when a defendant is convicted of *felony murder*, the aggravating circumstance set out in section 39-13-204(i)(7) does not narrow the class of death eligible murderers sufficiently under the Eighth Amendment to the United States Constitution and Article I, § 16 of the Tennessee Constitution "*because it duplicates the elements of the offense.*" *See Hall*, 958 S.W.2d at 692 (emphasis in original). "Implicit in this statement is the recognition that the circumstance properly *may be applied* if a defendant is convicted of *premeditated* first degree murder." *Id*. at 692 (emphasis added). In the present case, the evidence sufficiently supports the jury's finding that the premeditated murder was committed during the Appellant's robbery of Al-Maily and Atilebawi. We fail to find that the wording of the aggravating circumstance is vague or that the trial court's failure to require an election of offenses was error. *See State v. Blanton*, 975 S.W.2d 269, 280 (Tenn. 1998). Thus, the Appellant's challenges to aggravating circumstance (i)(7) are without merit.

### 3. Totality of Aggravating Factors Applied

With consideration of the evidence before the jury, we conclude that the evidence supports the jury's finding that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt.

### 4. Proportionality

This court is required by Tennessee Code Annotated section 39-13-206(c)(1)(D) and the mandates of *Bland,* 958 S.W.2d at 661-74, to consider whether the Appellant's sentence of death is disproportionate to the penalty imposed in similar cases. *State v. Godsey*, 60 S.W.3d 759, 781-82 (Tenn. 2001). The comparative proportionality review "is designed to identify aberrant, arbitrary, or capricious sentencing." *Stout*, 46 S.W.3d at 706. It does this by determining whether the death penalty in a given case is "'disproportionate to the punishment imposed on others convicted of the same crime.'" *Bland*, 958 S.W.2d at 662 (quoting *Pulley v. Harris*, 465 U.S. 37, 43, 104 S. Ct. 871, 876 (1984)). If a case is "'plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed,' then the sentence is disproportionate." *Stout*, 46 S.W.3d at 706 (quoting *Bland*, 958 S.W.2d at 668).

In conducting our proportionality review, this court must compare the present case with cases involving similar defendants and similar crimes. *Id*.; *see also Terry v. State*, 46 S.W.3d 147, 163-64 (Tenn. 2001). We select comparison cases only from those cases in which a capital sentencing hearing was actually conducted to determine whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death. *State v. Carruthers*, 35 S.W.3d 516, 570 (Tenn. 2000); *see also Godsey*, 60 S.W.3d at 783.

This court begins with the presumption that the sentence of death is proportionate with the crime of first degree murder. *Terry*, 46 S.W.3d at 163 (citing *Hall*, 958 S.W.2d at 699). However, this presumption applies only if the sentencing procedures focus discretion on the "'"particularized nature of the crime and the particularized characteristics of the individual defendant."'" *Id*. (quoting *McCleskey v. Kemp*, 481 U.S. 279, 308, 107 S. Ct. 1756, 1775 (1987) (quoting *Gregg v. Georgia*, 428 U.S. 153, 206, 96 S. Ct. 2909, 2940-41 (1976))).

In comparing this case to other cases in which the defendants were convicted of the same or similar crimes, this court looks "at the facts and circumstances of the crime, the characteristics of the defendant, and the aggravating and mitigating factors involved." *Id*. at 164. Regarding the circumstances of the crime itself, numerous factors are considered, including the following: (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of provocation; (7) the absence or presence of premeditation; (8) the absence or presence of justification; and (9) the injury to and effect on non-decedent victims. *Stout*, 46 S.W.3d at 706; *Terry*, 46 S.W.3d at 164. Contemplated within the review are numerous other factors, including a defendant's: "(1) prior criminal record; (2) age, race, and gender; (3) mental, emotional, and physical condition; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation." *Id*. In completing our review, we remain cognizant of the fact that "no two cases involve identical circumstances." *Terry*, 46 S.W.3d at 164. Thus, our function is not "to limit our comparison to those cases where a defendant's death sentence 'is perfectly symmetrical,' but only to 'identify and to invalidate the aberrant death sentence.'" *Id*. (quoting *Bland*, 958 S.W.2d at 665).

In the instant case, the facts presented at trial revealed that the Appellant and Atilebawi had been friends for some time. The Appellant was having car trouble with a vehicle borrowed or purchased from Atilebawi, and he stated that he planned revenge on Atilebawi for an alleged molestation of his pregnant girlfriend, as well as over the financial dealings. The Appellant and his accomplice discussed disposing of Atilebawi's body in the Wolf River, and he procured a weapon the evening prior to the shooting. The Appellant admitted that he shot both Al-Maily and Hussain Atilebawi. The unsuspecting victim, Atilebawi, was shot multiple times and left in the driveway. The Appellant was then admitted into the home by Al-Maily, and the Appellant took $300 from Al-Maily and then forced him into the bedroom. The Appellant and his accomplice then collected various items from the residence, loading the items into both Atilebawi and Al-Maily's vehicles. The Appellant then returned to the bedroom where he had instructed Al-Maily to remain. He forced Al-Maily onto the floor, covered him with a blanket, and executed him by firing one shot into the back of Al-Maily's head. As the Appellant was leaving, he looked back and noticed that Atilebawi was alive. Atilebawi was heard calling the Appellant's name.

The Appellant is currently the youngest person on Tennessee's death row, and he was nineteen years old at the time of the offense. He is one of ten children, although he does not share the same father with any of his siblings. His mother has been incarcerated throughout the majority of the Appellant's life. He was required to change schools frequently and ended up leaving school in the eleventh grade. The Appellant has a history of criminal convictions and juvenile adjudications. He is also HIV-positive. The Appellant was involved in his church, and he attended church without his family members. The Appellant also appears to be doing well in confinement and has completed numerous correspondence courses. However, the record reflects that the Appellant has failed to express remorse over his actions.

This court has upheld the death penalty in numerous cases in which the victim was shot in the course of a robbery or other felony offense.

> -In *Reid*, 91 S.W.3d at 260, the defendant received the death penalty for shooting two victims in the course of a robbery.

> -In *Stout*, 46 S.W.3d at 693-94, the defendant was sentenced to death for kidnapping the victim and shooting her in the head.

> -In *State v. Sims*, 45 S.W.3d 1, 5-6 (Tenn. 2001), the defendant was sentenced to death for shooting the victim in the course of a burglary.

> -In *State v. Burns*, 979 S.W.2d 276 (Tenn. 1998), the defendant shot and killed the victim during a robbery. The death sentence was upheld based upon the (i)(5) aggravator, despite evidence regarding the defendant's faith.

> . -In *State v. Hurley*, 876 S.W.2d 57 (Tenn. 1993), the defendant killed the victim by shooting him once in the head. The death sentence was upheld based upon the

sole aggravator that the murder was committed while the defendant was engaged in committing a robbery. Our supreme court upheld the death sentence.

-In *Howell*, 868 S.W.2d 238, the defendant murdered the clerk of a convenience store by shooting him once in the head during the course of a robbery. The defendant failed to express remorse, was a slow learner, and dropped out of school in the eighth grade. Our supreme court upheld the death sentence based on the aggravating circumstance that the defendant had previously been convicted of felonies involving the use of violence to the person.

-In *State v. Van Tran*, 864 S.W.2d 465 (Tenn. 1993), the defendant killed the victim during the course of a robbery by shooting the victim in the head. The defendant was age nineteen and had no prior record. Mitigating evidence included the defendant's good work record, cooperation with law enforcement, remorse, and educational problems. Our supreme court upheld the death sentence based upon the jury's finding of one aggravating circumstance: that the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death.

-In *State v. Smith*, 695 S.W.2d 954 (Tenn. 1985), the defendant robbed and killed a man by shooting him twice. The defendant confessed to the police. The jury sentenced the defendant to death after it found one aggravating circumstance: that the defendant committed the murder during the perpetration of a robbery. Our supreme court upheld the death sentence.

*See State v. Chalmers,* 28 S.W.3d 913 (Tenn. 2000) (murder committed during robbery); *State v. Hall*, 8 S.W.3d 593 (Tenn. 1999) (murder committed during robbery); *State v. Smith*, 993 S.W.2d 6, 18 (Tenn. 1999) (victim shot during robbery); *State v. Boyd*, 797 S.W.2d 589, 595 (Tenn. 1990) (victim shot during robbery); *see also State v. Henderson*, 24 S.W.3d 307, 310 (Tenn. 2000) (defendant shot a deputy sheriff in the back of the head at close range); *State v. Cribbs*, 967 S.W.2d 773, 777 (Tenn.1998) (defendant shot victim in the head during a robbery).

The death sentence has been upheld on multiple occasions involving youthful defendants or substantially similar mitigating evidence. For example, several cases have involved defendants who were the same or similar age as the Appellant. *State v. Davis*, 141 S.W.3d 600, 621-22 (Tenn. 2004); *State v. Pike*, 978 S.W.2d 904, 922 (Tenn. 1998); *Bland*, 958 S.W.2d at 674 n.26; *Bush*, 942 S.W.2d at 494. Likewise, numerous cases have involved defendants who relied on mitigating evidence of their adverse family backgrounds, poor childhood environments, drug usage, and other related issues. *Davis*, 141 S.W.3d at 622; *Stout*, 46 S.W.3d at 708; *Henderson*, 24 S.W.3d at 318; *Pike*, 978 S.W.2d at 922; *Bland*, 958 S.W.2d at 670.

In completing our review, we need not conclude that this case is exactly like prior cases in every respect, nor must this court determine that this case is "more or less" like other death penalty cases. *State v. Thomas*, 158 S.W.3d 361, 383 (Tenn. 2005). Rather, this court need only

identify aberrant death sentences by analyzing whether a capital case plainly lacks circumstances similar to those cases in the pool of cases in which a death sentence has been upheld. The penalty imposed by the jury in the present case is clearly not disproportionate to the penalty imposed for similar crimes.

## CONCLUSION

In accordance with the mandate of Tennessee Code Annotated section 39-13-206(c)(1) and the principles adopted in prior decisions of the Tennessee Supreme Court, we have considered the entire record in this cause and conclude that the sentence of death was not imposed arbitrarily. Moreover, we conclude that the erroneous application of the (i)(6) aggravating circumstance was harmless. The evidence supports the jury's finding of the (i)(7) statutory aggravating circumstance and that this aggravating circumstance outweighed any mitigating circumstances beyond a reasonable doubt. *See* T.C.A. § 39-13-206(c)(1)(A)-(C). Moreover, a comparative proportionality review, considering both "the nature of the crime and the defendant," convinces us that the sentence of death was neither excessive nor disproportionate to the penalty imposed in similar cases. Accordingly, we affirm the Appellant's conviction of first degree murder and resulting sentence of death imposed by the trial court. Based upon the foregoing, we also affirm the Appellant's convictions for especially aggravated robbery and criminal attempt to commit premeditated murder, as well as the resulting sentences.

_____
DAVID G. HAYES, JUDGE